Per Curiam :
This is a congressional reference case before the court pursuant to Senate Eesolution 309, 83d Cong., 2d *113 Sess., which resolution referred to the court S. 750 for a report sufficient to inform the Congress of the nature and character of plaintiffs’ claims as provided by 28 U.S.C. 1492 and 2509 and Rule 14 of this court.
The case was referred pursuant to Rule 45 to Marion T. Bennett, a trial commissioner of this court with directions to make findings of fact and recommendations as to the nature of plaintiffs’ claims. The commissioner has done so in a report filed July 21, 1960, which report is based in major part on the report filed by him in the companion case of Major C. Todd, Jr., et al., Cong. No. 16-54, this day decided ante, p. 87. Briefs and exceptions were filed by both parties and the case was submitted to the court on oral argument by counsel. Since after full consideration of the record, the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its recommendation to the Congress. It is therefore concluded and reported to the Congress that plaintiffs have an equitable but not a legal claim against the United States in the amount of $16,240.
The clerk will certify to the Congress pursuant to S. Res. 309, 83d Cong., 2d Sess., this opinion together with the opinion of the trial commissioner and the findings of fact which follow.
It is so ordered.
OPINION OP THE COMMISSIONER
This congressional reference case is before the court pursuant to sections 1492 and 2509, title 28, United States Code, and to Senate Resolution 309, 83d Congress, 2d Session, referring to the court S. 750 for a report sufficient to inform Congress of the nature and character of the plaintiffs’ demand as a claim, legal or equitable, against the United States, and the amount, if any, legally or equitably due from the defendant to the claimants. Todd and Parks, also referred to herein as plaintiffs, now claim $5,350 as the fair and reasonable depreciated value as of December 14,1943, of four sets of fishing nets and poles and $24,000 for the loss of their property rights in four licensed fishing locations below Cedar *114 Point, Maryland, in the Chesapeake Bay.[1] Plaintiffs say that defendant took these properties without paying just compensation as required by the fifth amendment to the Constitution. The suit is brought by G. W. Todd, surviving partner, and Bobert Parks, administrator of the estate of his father Lloyd Parks, deceased partner of the partnership formerly trading as Todd and Parks.
In 1940 and 1941 Todd and Parks were fishing and for many years had fished five nets in the Chesapeake Bay near Little Cove Point and five nets below Cedar Point. In 1941 the State of Maryland adopted conservation measures to limit pound-net fishing and to increase the supply of fish. (2 Annotated Code of Maryland, 1951, Art. 66C). The State thereafter required a license to fish and applicants had to meet certain requirements. Plaintiffs met those requirements and obtained licenses. These licenses could be, and were as a matter of right, renewed annually and the holders thereof had a form of property in those licenses so that they could be sold or pass by inheritance or devise. The statutes, set forth in the findings, required applicants to state the locations of their nets, and this information was made a matter of record by the Maryland Department of Tidewater Fisheries. The licenses themselves when issued did not identify the specific locations in the bay. Pursuant to and under such licenses plaintiffs fished five pound nets below Cedar Point through the end of the 1948 fishing season, terminating on or about June 1,1948.
On July 6, 1943, and December 14, 1943, the Secretary of War promulgated danger zone regulations governing navigation in the waters of the Chesapeake Bay between Cedar Point, Maryland, and Smith Point, Virginia. These regulations established restricted and prohibited areas for military purposes arising out of activities of the Patuxent Naval Air Station. From and after December 14,1943, plaintiffs were prevented by defendant from operating four of their nets below Cedar Point. One net was continued in use under restrictions accepted by plaintiffs, though not happily.
Effective April 19, 1949, the Secretary of the Army ap *115 proved amended regulations modifying existing restrictions below Cedar Point but still prohibited the placement of any permanent fishing structure in the waters without written approval of defendant. Plaintiffs’ nets were of this character. While they were removed annually from the water for repairs, they were affixed to long and sturdy poles while in the water and constituted a hazard to seaplane and other military activities while in use. On the other hand, plaintiffs could not use them except under restrictions, making their use obviously unprofitable on account of the fishing hours. These restrictions were imposed mainly to protect life, as the area was within a firing range.
Defendant urges that plaintiffs could have moved their nets elsewhere. The weight of the evidence does not support this view. Pound nets are specially designed for the depth of water and the bay floor where they are used. Further, there is no evidence that any other locations were available. Also, the State policy as shown by the evidence was to refuse requests for a change in locations for any reason. Plaintiffs’ nets and poles for four locations were a total loss after December 14, 1948, as a consequence of defendant’s actions. They had no resale or rental value.
The legal issues raised here by the parties essential to the attention of the court are discussed in an opinion in the case of Major C. Todd, Jr., et al. Cong. No. 16-54, filed contemporaneously with the instant case, ante, p. 87. As those issues and their treatment dispose of the questions of legal and equitable liability in this case, they are adopted by reference without repetition here. The petitions and the resolutions of reference all bear the same dates.
The evidence as to damages in this case is poor. Such as it is, the weight thereof supports the conclusion that the fair and reasonable depreciated value as of December 14, 1943, of the four nets lost to Todd and Parks by defendant’s actions was $2,400, poles $840, and fishing rights $13,000, or a total of $16,240. This valuation considers all of the relevant facts and circumstances set forth in the findings of fact.
It is concluded for the reasons stated in the opinion in Major C. Todd, Jr., et al., filed this day, and upon the findings of fact, that plaintiffs have an equitable but not a *116 legal claim against the United States for $16,240 and it is recommended that this should be reported to the Senate of the United States pursuant to S. Ees. 309, 83d Congress, 2d Session.
FINDINGS OF FACT
1. This claim is before the Court of Claims pursuant to S. Res. 309, 83d Congress, 2d Session, which provides as follows:
Resolved, That the bill (S. 750) entitled “A bill conferring jurisdiction on the Court of Claims to hear, determine, and render judgment on the claims of G. W. Todd and Lloyd Parks, copartners”, now pending in the Senate, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same, in accordance with the provisions of said sections, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.
2. S. 750, 83d Congress, 1st Session, which was introduced on February 2,1953, provides in part as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claims of G. W. Todd and Lloyd Parks, of Cris-field, Maryland, against the United States, (1) for the loss of their exclusive right of pound-net fishing off the western shore of Cedar Point, Maryland, due to the action of the Secretary of War, on February 19, 1943, in redefining the restricted area of the Cedar Point Naval Air Station; and (2) for the destruction by excavating and negligence of certain fishing gear and nets as a result of the negligence of certain Navy personnel while working on Cedar Point on May 1,1943.
*}* «!»
3. The petition in this cause was filed by G. W. Todd, surviving partner, and Eobert Parks, administrator of the es *117 tate of Lloyd Parks, deceased partner of tbe partnership formerly trading as Todd and Parks.
4. Since about 1930, G. W. Todd and Lloyd Parks, trading as Todd and Parks, engaged in commercial fishing business off the western shore of Maryland in the Chesapeake Bay. During the calendar years 1940 and 1941 Todd and Parks conducted commercial fishing operations off the western shore with 10 nets of the pound-net type.
Each of the partners operated somewhat independently of the other, G. W. Todd fishing five nets in the bay near Little Core Point, Maryland, and Lloyd Parks fishing five nets in the bay below Cedar Point, Maryland, but as a partnership, with the net profits from the operation of the partnership divided equally between the two partners.
5. A statute of Maryland, enacted into law and effective June 1, 1941, required fishermen engaged in specific types of commercial fishing operations in Maryland waters, including fishing with pound nets, to secure a license annually from the Maryland Commission of Tidewater Fisheries. From the time of enactment of such statute, the holders of licenses had a property right in the fishing grounds where they were licensed to fish, and such property right could be sold, pass by inheritance to the next of kin of a deceased owner, or be left to others by will. The requirements to be met in order to secure such annual licenses, and the rights possessed by the holders thereof, are set forth in volume I of the Maryland Laws Relating to the Tidewater Fisheries (2 Annotated Code of Maryland, 1951, Art. 66C), pertinent excerpts of which are as follows:
291. Licenses for Commercial Purposes. Any person who establishes to the satisfaction of the Commission that he actually used a pound net, haul seine, gill net, or fyke or hoop net more than 40 yards in length for the taking of fin fish for commercial purposes, at any time during the calendar years 1940 or 1941, shall be entitled to file application with the Commission of Tidewater Fisheries, prior to December 1st, 1941, and the Commission shall grant his application for a license to operate such, but only such nets as he actually operated at any time during such years.
*118 293. Application, For. Applications for license shall be filed on forms supplied by the Commission of Tidewater Fisheries, and accompanied by the fee fixed by law for the nets sought to be licensed. * * * The application shall also state the exact location where such net or nets will be set, in the case of pound nets. Failure to furnish such information or a false statement as to any material fact, shall constitute sufficient ground for denial of the application.
$ $ $ $ $
295. Renewal of Licenses. Licenses to operate neta granted under the authority of this sub-title shall expire on December 31st of each year, but shall be renewable annually to the person named therein, unless revoked or suspended for cause, provided application for renewal for the ensuing year be filed on or before December 1st of the preceding year. If any person shall fail to make a bona fide use of his license during any two consecutive license years, the license shall lapse and shall not be renewed. * * * provided, further, that if a licensee shall, at any time during the war emergency, be unable to fish all the nets for which he was licensed because of some condition arising out of the war, he shall not, in consequence thereof, be deprived of his right to license such nets thereafter.
296. Restrictions as to Pownd Nets. The Commission shall not grant a license to any person, under the provisions of this sub-heading, to operate a pound net on the location occupied by any other licensee or within four hundred (400) yards thereof measured at right angles to the line of stakes, unless such other licensee shall have failed to apply for renewal of his license on or before December 1st of the year for which it was granted. * * *
«í» •!»
299. Transfer of Licenses. Any license to operate pound nets, haul seines, gill nets, or fyke or hoop nets issued under this sub-title may be transferred whenever the owner of the nets, boats, gear and other equipment necessary for their operation, or the personal representative of such owner, shall sell and convey the same by bill of sale for a bona fide consideration to any person who is eligible under the provisions of Sections 258 and 294 of this sub-title. Such transfer shall be made only upon the surrender of the outstanding license and the execution of an application by the new owner or owners, as in the case of an original application, and the payment of the sum of $5.00 as a transfer fee, whereupon the Com *119 mission shall issue a new license for the remainder of the license year. No new license shall be issued if the outstanding license is suspended or revoked at the time of the transfer.
6. Pursuant to the statute quoted above, Todd and Parks made application for a license to fish 11 pound nets in specified locations below Cedar Point and near Little Cove Point. The locations were made a matter of record in the department.
On December 19, 1941, a fish net license, No. A 367, was issued by the State of Maryland, Department of Tidewater Fisheries, for the year 1942, “To fish in Bay, eleven (11) Pound nets in the waters of the State of Maryland as specified in the license application, under the restrictions of existing laws of this state.” The fee for the license was $15. A similar license was reissued for the 1943 and 1944 fishing seasons. For 1945,1946, and 1947 the licenses were renewed for 10 nets. In 1944 and 1945 the plaintiffs fished only five nets at Little Cove Point and one instead of five below Cedar Point, for reasons shown later, and in 1946 and 1947 the one below Cedar Point and four at Little Cove Point. Five nets proved as many as Todd and his crew could handle without his partner, who died in 1945. Licenses to fish only five nets were issued to Todd and Parks for the years 1948 and 1949.
7. On July 6,1943, the Secretary of War approved danger zone regulations governing navigation in waters of the Chesapeake Bay between Cedar Point, Maryland, and Smith Point, Virginia. Smith Point is south of Cedar Point. The regulations are in evidence. They were published in the Federal Begister on July 16,1943, and given wide public distribution. They defined a machine gun range about 2 miles wide along most of the southern shoreline of Cedar Point Cove and an aerial gunnery range covering a larger area including all of the waters of the cove. No vessels were permitted in the machine gun range. Through traffic was permitted in the aerial gunnery range.
The regulations were amended on December 14, 1943, redefining the danger zone and adding a seaplane landing area and a ground gunnery range covering much of the area of Cedar Point Cove. All vessels or other craft were prohibited from entering the machine gun range or seaplane landing *120 area at any time. The regulations prohibited all but military vessels in the areas of the aerial gunnery range and ground gunnery range during their use for firing practice, except for commercial craft proceeding on established steamer lanes in through navigation. These amended regulations were also given wide public distribution, including distribution to the Crisfield post office.
Five nets which Todd and Parks had previously fished below Cedar Point were within one or more of the prohibited or restricted areas mentioned above and described by the regulations. Pound-net fishing in the area of Little Cove Point was not restricted nor prohibited by defendant.
8. Commercial pound-net fishing in the bay is seasonal in character. Fishing begins about March 1 each year. However, preparation for the season begins in the late fall and continues through the winter. Preparation involves working on the nets and boats and obtaining replacement poles for the nets. Weather permitting, the poles are driven and nets hung thereon in February. This equipment is used to catch shad, herring, rock, hardheads and trout. The season continues until around June 1 when the nets are removed from the poles, repaired and stored, the poles are pulled from the water and stored on the bank, and the boats are painted. After actual fishing ceases the work mentioned continues for about a month and is taken up again in the late fall as stated above. The defendant’s regulations, heretofore described, did not interfere with Todd and Parks’ pound-net operations prior to the end of the 1948 fishing season. Between the seasons for pound-net fishing, plaintiffs dredged crabs and engaged in haul seining and oystering.
9. When it became apparent to Todd and Parks that the restrictions imposed by the Secretary of War in the Cedar Point Cove area would prevent use of plaintiffs’ nets there in 1944, a conference was held with a representative of the Patuxent River Naval Air Station, and others at the station, in late December 1943 or early January 1944. The purpose of the conference was to see what, if any, arrangements could be made about fishing in the Cedar Point Cove area. No partner of Todd and Parks was present at this conference, *121 but the partnership was represented by Major and Ira Todd, brothers of G. W. Todd.
10. The only pound-net fishing below Cedar Point was by plaintiffs Todd and Parks and by Todd Brothers, the latter plaintiffs in congressional reference case No. 16-54. Parks had fished five pound nets below Cedar Point prior to the adoption of the danger zone regulations. His partner, G. W. Todd, fished five nets off Little Cove Point as heretofore noted. Defendant gave these parties oral permission for the calendar year 1944 to fish 3 of the total of 10 nets fished previously by the two partnerships below Cedar Point. The two partnerships thereupon determined to pool for the 1944 season all of their pound-net fishing, totaling 13 nets (10 near Cove Point and Little Cove Point and 3 below Cedar Point). Under this arrangement the proceeds of seven nets (two at Cedar Point and five above Cove Point) would go to Todd Brothers and the proceeds of six nets (one at Cedar Point and five off Little Cove Point) to plaintiffs Todd and Parks.
11. The plaintiffs understood that under the arrangement with defendant for the 1944 season the setting of poles and nets could be done only at times approved by authorities at the Patuxent Naval Air Station. This delayed setting the nets for 2 weeks. Plaintiffs were also required to get out of the restricted area by 8 a.m. when gunnery practice commenced. This sometimes required fishing on tide with unsatisfactory results. The best fishing is done in slack water in the morning prior to 11 a.m. It was not always possible to service the nets and get the fish out before 8 a.m. Once, firing started before plaintiffs could get out of the area and shots came within 10 feet of G. W. Todd.
12. Although Todd Brothers after 1944 did not continue to fish their two remaining nets below Cedar Point due to the difficulties of working under defendant’s restrictions, plaintiffs Todd and Parks continued for several years to fish their one remaining net in this area. This net appears, from a chart in evidence, to be closer to shore than the other nets below Cedar Point and to be above the firing range. The net at this location caught more fish than the others. Todd and Parks were allowed to fish this single net without any *122 restrictions as to tbe amount of time spent at tbe net, but after tbe 1943 season, according to G. W. Todd’s testimony, it was necessary, in order to obtain permission to fish in tbe area, for him to request it and to execute a statement agreeing to “assume all responsibility for damages to government property, injuries or death to naval personnel, * * * tbat may result from my commercial fishing operations * * *” at tbe net locations specified in tbe statement furnished for bis signature by the defendant. Some of the plaintiffs’ requests and unsigned copies of these statements are in evidence together with signed letters of transmittal from tbe command^ ing officer of tbe Patuxent Naval Air Station specifying that they must be signed in order for plaintiffs to fisb that net. After December 14, 1943, defendant’s restrictions and prohibitions effectively prevented Todd and Parks from fishing their other four nets below Cedar Point.
13. Plaintiffs did not make any effort to secure licenses to use elsewhere their four eliminated nets below Cedar Point. They correctly understood that such an effort would have been futile. The policy of the commission was to reduce the shad and herring catch and it was rejecting applications made by others for new locations whether based upon poor fishing or prohibitory regulations of defendant. Further, lapsed licenses were not being reissued. All other desirable locations were licensed to others. Plaintiffs’ nets were designed for use in the locations where they had previously been used and for which licensed. They would not have been suitable elsewhere. Also, the evidence is that fishing was not good in other locations below Cedar Point and plaintiffs would not have desired to try these locations for that reason even had the policy of the commission permitted a change in location. Further, the distance to these others places would have been too great for use in connection with plaintiffs’ locations off Little Cove Point for the five nets there.
14. On February 25, 1949, the Secretary of the Army approved amended danger zone regulations “governing the use and navigation of waters of Chesapeake Bay from Smith Point to Cedar Point * * * by reducing the size of the aerial gunnery range, establishing two aerial target areas therein, and eliminating the ground firing range and sea *123 plane landing area * * The amended regulations prohibited the placing of any “permanent or semi-permanent fishing structure * * * on the western side of Chesapeake Bay between Point No Point and Cedar Point without prior written approval of the Commanding Officer, Patuxent Eiver Naval Air Station.” The regulations provided, further, that naval authorities would not be responsible for any damage by missiles to fishing structures or equipment.
These amended regulations became effective on April 19, 1949. They were published in the Federal Eegister on March 19, 1949, and thereafter publicly posted. All of the pound nets below Cedar Point for which plaintiffs Todd and Parks had licenses were within the prohibited and restricted areas as amended.
15. Todd and Parks did not attempt to resume fishing in four of their five licensed positions below Cedar Point after the effective date of the amended danger zone regulations. This was due in part to the change which came too late for plaintiffs to do the preparatory work in getting out poles and nets before the season started. However, the principal reason they did not resume fishing was because the restrictions, while amended, were not in fact lifted, and they would have had to fish under difficulties mentioned above. Further, plaintiffs in 1949 had no poles and nets for the Cedar Point locations. After they gave up fishing there, for reasons heretofore described, they pulled out their poles and nets which thereafter rotted or were destroyed and were of no use by 1949. Bising costs of such equipment, the considerable capital investment which would have been involved to replace it, the time factor, defendant’s restrictions on the equipment’s normal use, and the evident limitation that only one of the five Cedar Point locations could be used by plaintiffs made resumption of fishing below Cedar Point impractical. There was no opportunity for resumption of normal commercial fishing by plaintiffs after the 1949 amendments.
DAMAGES
16. The value of Todd and Parks’ fishing rights cannot be determined from prices paid for similar rights, there being no evidence that any such rights had been sold in arm’s- *124 length transactions or otherwise. There is, accordingly, no proof of market value or transfers or sales of licensed fishing grounds in Chesapeake Bay. The evidence establishes that rental of licensed fishing rights is unknown in the area.
17. Pound nets, such as used by Todd and Parks, derive their name from the manner in which they impound or corral the fish which they capture. They are stationary devices of poles and netting arranged to form a trap. They are the most effective means of catching fish in a net. A long leader in relatively shallow water near the shore directs the fish into the main body of the trap (the heart) in water up to 40 feet deep. A pound net can be as long as 1,500 feet. It requires between 140 and 150 poles to support it. These poles are from 6 to 9 inches in diameter and 30 to 55 feet long. The weight of the evidence is that a pound net is designed specially to fit the particular location where it is to be used and is generally unusable elsewhere. In addition to the net and poles, each pound net required equipment consisting of blocks, tackle, weights, ropes, rings, pulleys and chains.
18. Some parts of a pound net wear out more quickly than others. The nets require annual repairs. On the average, in the use to which plaintiffs put such nets, enough miscellaneous parts would have to be purchased annually to constitute the replacement of one net out of five. Poles had a useful life of 2 to 4 years before requiring replacement because of rotting. Exposure to air when stacked on the beach between fishing seasons causes the poles to become brittle. They are not treated with creosote. It was necessary to buy about 150 replacement poles annually for five nets and each net used about 150 poles. Equipment used in connection with the nets and poles had a useful life of about the same period. There is no evidence that pound nets, poles and appurtenant equipment have any secondhand or salvage value. All of plaintiffs’ nets and equipment at the beginning of the 1944 season were in good usable condition.
19. There is no evidence of plaintiffs’ actual expenditures for nets and parts thereof. Plaintiffs, however, offered the testimony of an expert witness, a representative of the Linen Thread Company, Baltimore, Maryland, a manufacturer of *125 pound nets. He gave an estimate, based on 1948 prices, that a pound net of the general size and description used by plaintiffs for the locations below Cedar Point, including all material, labor and discounts would cost $1,664.76 new. Plaintiffs’ nets were actually a little smaller. It is found that $1,500 represents the fair and approximate price of each net used by plaintiffs, purchased new, and further that this would be the approximate cost of the component parts plaintiffs would have purchased annually. Plaintiffs ordinarily did not buy an entirely new net but would use parts purchased to keep the nets they had in good repair. One new head for one of the nets had been purchased for the 1944 season. Defendant prohibited its use after it had been set out. It rotted in the water.
20. In accordance with the foregoing findings, at the end of any one year the condition of plaintiffs’ five nets was that one was fully depreciated, or the equivalent of 5 years of its useful life consumed, one the equivalent of 4 years depreciated, one the equivalent of 3 years depreciated, one the equivalent of 2 years depreciated, and one the equivalent of 1 year depreciated. Thus, the five nets had an aggregate depreciation of the equivalent of 15 net years out of a normal useful life of 25 net years for all five nets. The remaining useful life of all of the nets was therefore the equivalent of 10 net years or 40 percent of their new cost of $7,500 or $3,000. It has been previously found, however, that plaintiffs actually were able to continue use and did continue the use of one of their five nets below Cedar Point after defendant’s restrictions were promulgated. The value of this net was not lost by defendant’s actions. Thus, they did not lose the value of five nets but rather four. It is found that $2,400 is the depreciated value of the four nets Todd and Parks had below Cedar Point as of December 14, 1943.
21. The market price for poles in 1943 varied somewhat, according to the length thereof, but for the five licensed locations plaintiffs had below Cedar Point the poles cost an average of $3.50 each in 1943, or $525 per net, and for five nets a total of $2,625 new. The poles, however, like the nets, were not all new in 1943. As heretofore noted, they were replaced annually at an equivalent of about one new set *126 of 150 poles. The other poles on band thus varied in age and condition. It is found that the depreciated value of plaintiffs’ poles for the five nets below Cedar Point in December 1943 was $1,050. One set of poles was used for the net plaintiffs continued to use to fish below Cedar Point. The depreciated value of the four sets of poles for the four nets plaintiffs had to abandon below Cedar Point was $840 at the time of taking, December 14,1943.
The cost of other equipment used in connection with the pound nets is not established by the evidence.
22. There are no books and records in evidence from which it is possible to ascertain plaintiffs’ income from pound-net fishing prior to 1943. For the years 1945 through 1950 there are in evidence the income tax returns of Todd and Parks (1945), Geo. Todd and Geo. Todd, Jr., (1946), Geo. Todd, Geo. Todd, Jr., and Robt. Parks (1947), Geo. Todd, Geo. Todd, Jr., Robt. Parks, and Willis Todd (1948, 1949 and 1950). The 1946 return includes fishing and freighting by boat. How much of the income was for freighting is not shown. A net loss is claimed. The other returns reflect only the business of fishing. G. W. Todd testified it was only pound-net fishing. The income, except for 1945 when six nets were fished, was for five nets, four at Little Cove Point and the one below Cedar Point. Plaintiffs admit that the nets at Little Cove Point were about 10 percent more profitable than the others prior to 1943. The average net income for the years 1945-1950 was about $2,900.
23. The petition claims $21,500 and plaintiffs’ requested findings claim $24,000 as the reasonable value of plaintiffs’ right of fishing four pound nets below Cedar Point, which right was permanently frustrated by defendant. This valuation is not supported by the evidence. The evidence furnishes no basis to determine with any preciseness the fair and reasonable value of plaintiffs’ fishing rights, destroyed by defendant. Considering, however, the nature of the property right and the quality of the fishing locations, the great length of time which they had furnished plaintiffs’ livelihood profitably, the uses to which the rights would have continued to be put by plaintiffs but for defendant’s intervention, the earnings from other locations and all other *127 relevant facts and circumstances, it is found that the fair and reasonable value of the four fishing locations taken below Cedar Point as of December 14,1943, is $13,000 and that this would represent just compensation to plaintiffs to which should be added the depreciated value of the nets and poles in the sum of $3,240 for a total of $16,240.
24. In addition to pound nets, the Maryland Commission of Tidewater Fisheries licensed for commercial fishing purposes, haul seine and fyke or hoop nets and gill nets. Todd and Parks were inexperienced in the use of such nets. There is no evidence that they owned any such nets or, if they had obtained and used them, that such nets would have been satisfactory substitutes for pound nets.

 The petition claims $30,000 for loss of nets, poles and Ashing rights, representing $8,500 for loss of nets and poles and $21,500 for Ashing rights.