**NATIONAL FOOD & BEVERAGE CO., INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 10–152L.

United States Court of Federal Claims.

Aug. 29, 2012.

682

Darrell K. Cherry, Deutsch, Kerrigan & Stiles, LLP, New Orleans, Louisiana, for plaintiff. With him at trial was Jimmy Courtenay, Deutsch, Kerrigan & Stiles, LLP, New Orleans, Louisiana.

Brook B. Andrews, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Frank J. Singer and James D. Gette, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This post-trial decision concerns a taking by the United States of property for public use without providing just compensation to the owner. The fundamental facts of the case are not disputed. In 2006 and 2007, the United States Army Corps of Engineers ("Corps" or "the government") employed a contractor to remove more than 380,000 cubic yards of clay from the land of National Food & Beverage Co., Inc. ("National Food" or "plaintiff"), without compensating National Food for the removed clay. The Corps used the clay to repair levees in southern Louisiana, which had been damaged during Hurricane Katrina. The chief issues still in dispute are (1) whether National Food actually owned the clay in question, and (2) if so, what just compensation ought to be awarded. In February and March 2012, the court held an

eight-day trial in New Orleans, Louisiana, including a site visit to National Food's land where the clay had been removed. Post-trial briefing has been completed, and on June 28, 2012, the parties presented their closing arguments. The case is accordingly ready for disposition.

## FACTS[1]

### A. National Food's Land

In 1999, National Food purchased from CLL Limited Partnership, Ltd. ("CLL") some 563 acres of land located approximately twenty-seven miles southeast of New Orleans, in Plaquemines Parish. See PX 19-1, -8 (Sale Agreement).[2] In negotiations over the sale, CLL was represented by Mr. Edwin Blair, vice-president of CLL. Tr. 94:1-4 (Blair). National Food was represented by its CEO, Mr. Hai Nguyen. Both parties retained counsel to review the transaction and the deed of sale, which had been drafted by CLL. Tr. 61:11-15, 79:25 to 80:2 (Nguyen); Tr. 102:14-18 (Blair). Of particular interest to this litigation is a clause in the deed of sale that reserves to CLL "all oil, gas and other materials in or under the property." PX 19-6.

At trial, both signatories to the agreement—Mr. Blair and Mr. Nguyen—testified as to their understanding of that clause. Mr. Blair stated that the term "other materials in or under the property" was intended to encompass clay. See Tr. 115:15-18. At the time of the sale, CLL was operating a clay pit about seven or eight miles from the subject property, and it supposedly did not want another borrow pit opening nearby to compete with its own. Tr. 94:24 to 95:4; 101:3-14 (Blair). Mr. Blair believed the broad sweep of the term "materials" would encompass clay and could be differentiated from deeds containing a narrower reservation of "gas, oil, and other *minerals*." Tr. 102:1-4 (emphasis added). Mr. Blair testified that in

---

1. This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set out in the analysis.

2. The description "PX———" refers to plaintiff's trial exhibits, and "DX———" refers to defendant's trial exhibits. The number before the hyphen designates the particular exhibit being cited, and the number after the hyphen refers to a specific page of the exhibit.

his experience a reservation of "materials" was "very, very unusual," Tr. 101:19, and that he had never used or seen it before, Tr. 119:21 to 120:7. At trial, however, this testimony was undermined when plaintiff's counsel produced an earlier deed executed in 1997 by CLL that also reserved "all oil, gas and other materials in or under the [p]roperty." PX 372–1, 4; see also Tr. 122:1–17 (Blair).

Mr. Nguyen's testimony places the reservation clause in a broader context. Mr. Nguyen stated that, during negotiations over the price of the property, Mr. Blair had never raised the issue of reserved rights to soil or types of soil in meetings with Mr. Nguyen, and, indeed, he also had never raised the matter after the sale. Tr. 48:2–6. Mr. Nguyen indicated that the reservation clause was not significant to him until 2009, when he learned about it in the course of business talks with a Texas oil company. Tr. 45:21–23.

## B. Rebuilding Levees in Southern Louisiana After Hurricanes Katrina and Rita

In August and September of 2005, approximately six years after CLL sold the land to National Food, Hurricanes Katrina and Rita decimated the coast of southern Louisiana, causing deaths and destroying property. Infrastructure damaged by the two storms included the system of levees protecting New Orleans and the surrounding parishes. Public officials had long recognized the risk posed to the area by a hurricane, and the levee system had been constructed to defend against such a threat. However, many of the levees had been diminished by subsidence and erosion when Hurricane Katrina struck, while others had never been finished due to funding shortages. The storm surge overtopped and breached these earthen barriers at numerous points, eliminating the protection they had previously provided. See PX

28–4 (New Orleans to Venice, LA Hurricane Protection Project Information Report).

In the aftermath of the storms, the Corps set about restoring, strengthening, and improving the levees. The agency divided this mission into two distinct efforts. The first was Task Force Guardian, which began around October 2005. Tr. 1568:19–22 (Test. of Brett Herr, a senior project manager with the Corps). This project focused solely on repairing the damage to the levees incurred during the hurricanes. Tr. 367:25 to 368:4 (Herr); see also PX 28–4 ("Rehabilitation assistance is necessary to [establish] a pre-storm condition and level of protection."). The work was undertaken pursuant to Public Law No. 84–99, 69 Stat. 186, which pertains to "the repair or restoration of any flood control work threatened or destroyed by flood, including the strengthening, raising, extending, or other modification thereof." See also Tr. 393:1–3 (Herr). This emergency effort would eventually require approximately seven million embanked cubic yards of clay. Tr. 391:16–22 (Herr).[3] The Corps achieved most of the aims of Task Force Guardian by June 2006, although it did not finish the work completely until some months later. Tr. 1568:22–24 (Herr).

The second effort was the Hundred–Year Protection program, which authorized the Corps to go beyond simply repairing and restoring the levees and actually to improve them. Tr. 367:20–25 (Herr). As the name of the program suggests, its goal was to protect New Orleans and environs from high-magnitude storms that would be expected only once in a century. Tr. 1534:19–24 (Herr). The billions of dollars required for this massive undertaking were appropriated by Congress on June 15, 2006. See Pub.L. No. 109–234, tit. 2, ch. 3, 120 Stat. 418, 453–474; see also Tr. 535:15–18 (Herr). Although the exact amount of clay needed for the Hundred–

---

**3.** The density of a given volume of clay varies depending on whether it is banked, loose, or embanked. Banked clay is measured as it is found in a borrow pit. Loose clay is measured after the clay has been excavated and loaded onto a truck. And lastly, embanked clay is measured once the clay has been compacted in place on a levee. The parties have stipulated that 1 banked cubic yard is equivalent to 1.27 loose cubic yards. Notice of Stip. ¶ 1, Mar. 1, 2012 ("Stip."), ECF No. 112. The ration of loose to embanked clay varies depending upon composition and condition, ranging from one and one-half to two cubic yards of loose truck-hauled clay to one yard of embanked clay.

The Stipulations filed by the parties in mid-trial will be cited as "Stip."

Year Protection work has fluctuated over time, the Corps currently expects that it will embank 70 to 100 million cubic yards by the time the project is complete. Tr. 387:20–24 (Herr); Tr. 1192:1–6 (Test. of Soheila Holley, a senior project manager for the Corps).

The agency identified three methods of acquiring clay to meet the demands of these efforts. The first was to obtain government-furnished sources, *i.e.*, to locate and acquire clay reserves or to use clay embedded in government-owned land. *See* DX 139–1; Tr. 384:10–14 (Herr). The Corps would then hire a contractor to extract the clay and place it on a levee. The second method was to rely on contractor-furnished clay, *i.e.*, to pay a contractor both to obtain clay and to use it to repair the levees. *See* DX 139–1; Tr. 384:15–17 (Herr). The Corps maintained a list of privately-owned sites that contained suitable clay, *see, e.g.*, DX 139–3; a contractor could contact an individual from that list and negotiate directly with him or her for the right to remove the clay from the property. Tr. 442:6–19 (Herr). The third method was to enter into supply contracts, *i.e.*, to pay contractors to deliver clay to a worksite (but not to perform levee repairs themselves). Tr. 1241:1–4 (Holley). During Task Force Guardian, the Corps used only government-furnished clay and supply contracts to meet its needs. *See* Tr. 386:4–5 (Herr). After the immediate urgency waned, however, the agency has relied upon all three sources for the Hundred–Year Protection work. Tr. 436:9–13 (Herr).

One way the Corps secured government-furnished clay was through Louisiana's Homeland Security and Emergency Assistance and Disaster Act, La.Rev.Stat. Ann. §§ 29:721–736; *see id.* §§ 29:724(D)(4), 29:727(F)(4). In October 2005, the Corps and Plaquemines Parish ("the Parish") entered into a Cooperation Agreement for Rehabilitation of a Federal Hurricane/Shore Protection Project ("Cooperation Agreement"). PX 35. This agreement was subsequently modified in January 2006. PX 83. Under the Cooperation Agreement, the Parish agreed to commandeer a right of entry onto any private lands that were needed to supply clay for levee repairs. PX 83–4, –5.

The Parish would then transfer this right-of-entry to the Corps, and the Corps would use that right to enter upon private land to remove clay. *Id.* In the Cooperation Agreements with parishes, the Corps agreed that it would provide just compensation to the private landowners. *Id.*

In addition to commandeering entry upon clay-rich lands, the Corps also pursued contractor-furnished and supply-contract sources of clay. Beginning in late 2005, the agency issued a series of solicitations for "Indefinite Delivery–Indefinite Quantity" contracts for clay. *See, e.g.*, PX 45. Between January 4, 2006, and June 30, 2006, it awarded six contracts for the delivery of clay to sites in Plaquemines Parish and the neighboring St. Bernard Parish. *See* DX 36. Under these contracts, the Corps paid prices ranging from $21.82 to $33.00 per cubic yard, which included excavation, processing, transport, and delivery. *See* DX 36–23; DX 36–44. The Corps issued numerous task orders against these contracts in the first half of 2006. *See, e.g.*, PX 76 (task order dated Jan. 9, 2006); PX 205 (task order dated June 30, 2006).

### C. *The Removal of Clay from National Food's Land*

Several years before the landfall of Hurricanes Katrina and Rita, the Corps had conducted soil borings on National Food's property in anticipation of a freshwater diversion project. Tr. 165:15–19; 168:6–12 (Test. of Ellsworth Pilie, a lead civil engineer with the Corps). Consequently, after the hurricanes hit southern Louisiana, Corps officials knew that the National Food site contained reserves of acceptable clay, as did an immediately adjacent property owned by Conoco-Phillips. Tr. 172:20–25; 181:4–7 (Pilie). On January 17, 2006, the Corps asked the Parish to grant the Corps a right of entry onto ConocoPhillips' and National Food's properties pursuant to the Cooperation Agreement. *See* PX 84–16 (Letter from Linda Labure, Chief, Real Estate Div., Corps, to Benny Rousselle, President, Plaquemines Parish (Jan. 17, 2006)). The Corps prepared an order for the Parish president to execute, entitled "Commandeering Property for Borrow Material, Stockpiling, and Access; and

Authorization for Entry for Construction, Borrow, Stockpiling, and Access" ("Commandeering Order"). DX–32.

The Parish president signed the Commandeering Order on January 26, 2006. DX 32–3. This order commandeered approximately 77.2 acres of property to "be used for access; to obtain borrow material; and to stockpile or process material for construction." DX 32–2. Included in this land was about 46.2 acres of National Food's property. Tr. 2113:10–14 (Test. of Michael Truax, an appraiser retained by the government). The other lands subject to the commandeered right of access belonged to ConocoPhillips and bordered National Food's land to the east, bounded on the other side by the Mississippi River. DX 33–3. Although signed in late January 2006, the Commandeering Order was not implemented immediately. After doing preliminary surveying and testing work, the Corps' contractor, Shaw Environmental and Infrastructure, Inc. ("Shaw"), began excavating clay from ConocoPhillips' property. DX 33–3. About four months later, on or slightly before June 1, 2006, Shaw entered National Food's property. Tr. 153:8–19 (Test. of William Scoville, a project and program manager with Shaw). Shaw began excavating clay from National Food's land on June 13, 2006, and continued that work for a period of approximately nine months. See Stip. ¶ 2.

Overall, Shaw removed 383,871 banked cubic yards of clay from National Food's land. Stip. ¶ 1.[4] The excavation site was an 18.30–acre strip of land, termed Tract P602 ("the borrow pit"). See DX 31–21 (Truax Report). Adjacent to the borrow pit was a 25.80–acre staging area, where Shaw stored and processed the excavated clay and loaded it onto trucks. Id. Shaw also constructed an access road over 2.16 acres of National Food's land, connecting the staging area to a secondary public road. Id. Shaw transported the clay along this secondary road to Louisiana High-

way 23, and from there to the Buras Levee (approximately 23 or 28 miles from plaintiff's property).[5] There it was compacted and emplaced by Shaw per its contract with the Corps. See DX 33–4 to –7. Shaw removed its equipment and vacated plaintiff's property by March 30, 2007. DX 33–3; see also Stip. ¶ 2. At this point, the borrow pit was twenty feet deep, roughly several hundred yards wide and one-half mile long, and would eventually become a small lake or large pond. Cf. Tr. 1674:4 to 1675:23 (Test. of Pierre Hingle, an engineer working as a contract administrator for the Corps). The site visit disclosed that the staging area had largely returned to the condition in which it was found before Shaw's activities. See also DX 31–51 (Truax Report).

## D. The Market for Clay in and around Plaquemines Parish

Clay was in high demand in southern Louisiana after Hurricane Katrina. In the wake of the storm, the Corps embarked on a large-scale effort to rebuild and improve the levee system, which would require an estimated 100 million cubic yards of clay. See Tr. 387:20–24 (Herr); Tr. 391:16–22 (Herr); Tr. 1192:1–6 (Holley). The Corps informed the general public of the magnitude of this need and actively solicited contractors to provide levee-suitable clay. See Tr. 344:2–23 (Test. of Cynthia Nicholas, a contracting officer with the Corps); Tr. 422:18 to 423:9 (Herr). Contractors heeded this call, Tr. 565:6–12 (Howell), and approached owners of property with known clay reserves, such as National Food, to inquire about purchasing the clay, Tr. 51:16–21 (Nguyen); see also Tr. 112:1–9 (Blair).

At trial, the parties presented both expert and lay testimony concerning the market for clay before and after Hurricane Katrina. The plaintiff's chief expert was Dr. Jonathan Stuart Wood, a professor of economics at Loyola University. See Tr. 706:20–22

---

4. The clay removed amounted to 488,668 cubic yards in loose measure. Stip. ¶ 1.

5. The plaintiff's experts used the figure 23 miles between the subject property and the levee site. See, e.g., Tr. 750:5–8 (Test. of Stuart Wood); Tr. 906:14–18 (Test. of Jerry Howell). Shaw's completion report and an expert testifying for the

government stated that the distance was 28 miles. See DX 28–13 (Report of John Lizak) ("Lizak Report"); DX 33–3 (Narrative Completion Report for P24 Contract). In any event, the discrepancy of five miles is immaterial to the outcome of the case.

(Wood). To calculate a fair market royalty, Dr. Wood started with the price that the Corps paid its contractors to purchase, excavate, and deliver clay to one of its levee sites (typically $25.00 per cubic yard). PX 316–3. From this he deducted the cost of extracting clay from the ground ($4.00 to $5.00 per cubic yard) and then the cost of transporting it to the site ($5.80 per cubic yard, assuming a distance of approximately 25 miles). *Id.* Lastly, he acknowledged that a landowner might have to pay an entrepreneurial fee to a contractor to perform these tasks ($1.50 to $2.00 per cubic yard). Tr. 750:13–19 (Wood). Dr. Wood posited that the residual amount, ranging from $8.00 to $15.00 per cubic yard, would be retained by the owner as a royalty for the clay. *See* PX 316–3; *see also* Tr. 750:2–24. Dr. Wood based his approach and step-by-step deductions upon information supplied by one market participant, Mr. Jerry Howell. Tr. 809:24 to 810:4; *see also* Tr. 810:23 to 811:11. Dr. Wood was not actually aware of any landowner who received a royalty within his range. Tr. 803:9–13.

The plaintiff's second witness on the local market for clay was Mr. Howell, an entrepreneur with extensive experience in the clay business following Hurricane Katrina. Tr. 560:17 to 561:14 (Howell).[6] He used two methodologies to determine the fair market royalty rate for clay at the time of the taking. First, Mr. Howell employed a technique nearly identical to Dr. Wood's method, deducting the expenses of excavating and transporting clay from the price paid in the Corps' supply contracts. Tr. 907:11 to 908:3. Under this approach, he derived a fair market value of $12.50 per cubic yard. Tr. 908:3. Like Dr. Wood, Mr. Howell conceded that his technique was somewhat theoretical. He noted that his method "didn't say that this is [the royalty] the landowner received" but rather "this is what the landowner *could* receive." Tr. 591:8–10 (emphasis added). In fact, in his own clay dealings Mr. Howell had never paid a royalty greater than $8.00 per cubic yard. Tr. 900:21–23.

Mr. Howell used a second, alternative methodology to suggest another value for the clay. Under this approach, he looked to an existing contract for clay that he had with White Oak Realty to serve as a comparison for what National Food could have received for its clay. Tr. 592:12–22; 593:9–18. The listed royalty for this contract was $8.00 per cubic yard. DX 145–3. However, the landowner granted certain reductions in the price, such that the average royalty paid by Mr. Howell was approximately $7.45. Tr. 1150:20–21.

Mr. Howell also testified about a contract between his company Evenstar, Inc. ("Evenstar") and National Food for the purchase of the latter's clay. *See* PX 231 (Clay Sales Agreement). This agreement, signed on December 4, 2006, gave Evenstar the right to remove clay from National Food's property for a royalty of $4.00 per cubic yard. PX 231–1. Mr. Howell's company bore the costs of testing the soil and obtaining the proper approvals, Tr. 891:9–17 (Howell), and also paid a non-refundable $100,000 advance to National Food, *see* PX 231–1. This contract was for a term of three years, with a one-year option. PX 231–1 to –2. However, Evenstar never excavated any clay under this contract. Tr. 894:4–6. Mr. Howell encountered difficulties in securing approval from the Corps, which believed that the site could contain protected wetlands. Tr. 893:1–4. By the time he overcame this hurdle and obtained approval, the market for clay had subsided and he could not find a buyer for the clay. Tr. 894:4–16.

The government presented the testimony of Mr. John Lizak, a professional geologist with Mineral Valuation & Capital, Inc. Mr. Lizak has considerable education and experience in assessing the value of mineral deposits. Tr. 2198:15 to 2199:3 (Lizak). He developed a market rate for clay by gathering royalties from a number of property-owners, borrow-pit operators, and clay suppliers in the area. DX 28–19 (Lizak Report). Included among these market participants were all the landowners on the Corps' list of pre-

---

**6.** The court did not find Mr. Howell qualified to provide expert testimony pursuant to Fed.R.Evid. 702; consequently, Mr. Howell's testimony was limited to his personal experience in the clay market as a lay witness under Fed.R.Evid. 701. Tr. 634:1 to 635:7.

approved clay sources except National Food and White Oak Realty, who were deemed to have an interest in this litigation. DX 28–19. Mr. Lizak asked them not only how much their royalties were, but also if they could provide an estimate for the market-royalty rates for clay in Plaquemines Parish in January 2006. DX 28–20. Additionally, Mr. Lizak inquired to see whether the interviewees' properties had any unusual characteristics that would make them inappropriate for direct comparison to National Food's clay deposits. DX 28–20 to –21.

After conducting these interviews, Mr. Lizak had assembled twenty-one royalty rates: three taken from actual contracts and eighteen obtained in phone conversations with market participants. DX 28–29. His next step was to try to ensure that these rates would be comparable to what National Food would have received at market rates in 2006. If an interviewee gave him a range of values, he tried to find where a borrow pit like the one Shaw excavated on National Food's land would fall within that spread. Tr. 2239:22 to 2240:6. In a few instances, he excluded rates that were unrealistically low. Tr. 2271:1 to 2272:8; see also DX 28–21 ("For example, participant No. 5 noted that his $0.75 per bank cubic yard royalty rate was based upon an appraisal primarily done for tax planning purposes. Participant No. 14 noted that he paid $1.75 per in-situ cubic yard in 2006, but that this rate was paid for an unusually small job."). By the time he finished this process, he had assigned a fixed dollar amount to each of the interviewees. See DX 167 (Lizak's Worksheet); see also Tr. 2272:19 to 2274:14. Drawing upon these figures, Mr. Lizak concluded that a fair market value for

clay after Hurricane Katrina was somewhere in the range of $2.00 to $4.00 per banked cubic yard. DX 28–22; Tr. 2276:9–11.[7] His best estimate within this range was $3.25, although he admitted that this value was inherently imprecise. Tr. 2275:5, 15–18.

A contentious issue attendant to the market value of banked clay in January 2006 centers on what the price obtainable in 2006 would have been absent the Corps' extraordinary demands following Hurricane Katrina. Task Force Guardian and the Hundred–Year Protection work required a combined total of approximately 100 million cubic yards of clay. Virtually all of the witnesses agreed that this pressing government demand was a driving force in the clay market in 2006. See Tr. 745:15 to 746:2 (Wood); 872:11 to 873:4 (Howell); DX 28–12 to 13 (Lizak Report).[8] Both government witnesses, Mr. Lizak and Mr. Truax, testified that no substantial market for clay existed apart from the Corps' projects. Mr. Lizak stated that "there was no market for levee borrow clay before the Corps' Task Force Guardian Project following Hurricane Katrina." DX 28–12 (Lizak Report). Although he uncovered more than twenty royalty rates for clay sales after the storm, see DX 28–29, he could not find any clay royalties negotiated in the region prior to the hurricane. Tr. 2260:4–17 (Lizak). Mr. Lizak attributed this lethargic market to the fact that "[c]lay is ubiquitous within the local region and the [s]tate," such that the supply outpaced demand. DX 28–12. Mr. Lizak undercut his own statement on the subject by relating in his expert report that "[m]ajor uses for . . . common clay are brick, portland cement, and lightweight aggregate. . . . Additional lesser uses for common

---

7. At trial, Mr. Lizak stated that the royalty ranged between $2.00 and $4.00 per *ton*. Tr. 2276:9–11. Using his conversion factor of three tons to two cubic yards, see DX 28–20, this would equate to a range of $3.00 to $6.00 per cubic yard. This assessment generally corresponds with his final recommendation of $3.25 per cubic yard, Tr. 2275:1–5, but in terms it conflicts with his expert report, DX 28–22 ("The royalty rates provided by the market participants generally fell within the $2.00 per in-situ *cubic yard* to $4.00 per *in-situ cubic yard*.") (emphasis added). Nonetheless, his derived royalty rates fell within a relatively narrowly circumscribed band of values.

8. Mr. Truax was the only witness to question the conventional wisdom that the Corps' need for clay resulted in an overall higher demand (and price) for the product. In his opinion, the record of land sales in the area did not reflect an increased demand for clay-bearing land following Hurricane Katrina. Tr. 2133:20 to 2134:4 (Truax). However, he admitted that he did not know for certain whether the tracts of land that were sold contained clay reserves; rather, he assumed that they did because in his view the "whole area is underlined with clay-based soil." Tr. 2133:5–13.

clay include borrow material or fill used for landfill liner, commercial projects, and the repair and construction of levees." DX 28–12 (Lizak Report) (emphasis omitted). Mr. Truax offered little explanatory detail for his conclusory statement. Tr. 2129:1–3 ("[B]ut for the projects that were ongoing regarding levee reconstruction and repair, there was no general market demand for clay-based materials in that location.").

Lay witnesses with first-hand experience in the clay market disagreed and testified that a market for clay existed pre-Katrina, based upon a variety of uses. These individuals identified a number of non-federal applications for clay in southern Louisiana. It is used for berms surrounding oil storage tanks, refineries, grain terminals, and power plants, Tr. 157:13–22 (Scoville), to build liners and caps for landfills, Tr. 904:12–15 (Howell), to provide stable support for bridge piers and abutments, Tr. 904:9–10 (Howell), and for other construction purposes, Tr. 904:3–8 (Howell), such as non-federal and private levees. Mr. Scoville of Shaw indicated that clay is used locally, particularly by corporations and local governments to build non-federal levees. See Tr. 157:5–9 (Scoville) (describing Shaw's "levee work for commercial entities to protect industrial properties" such as power plants); Tr. 1516:16 to Tr. 1517:5 (Herr). He stated that Shaw had a number of projects for non-federal entities requiring clay. Tr. 154:17–20; Tr. 156:15–17 (Scoville). Additionally, Mr. Howell estimated that about thirty to forty percent of his company's clay sales were to entities other than the Corps. Tr. 904:16–19.

Two witnesses were able to testify about the clay market before Hurricane Katrina. Because these transactions antedate the Corps' emergency need for clay, they shed some light on the market for clay prior to the storm and absent the government's extraordinary demand. Mr. Blair testified that CLL operated a clay pit sporadically from the 1980s until 2001, when it was shut down. Tr. 95:5–11; Tr. 96:12–17 (Blair). During that time, the company sold clay by the acre instead of the cubic yard. Tr. 96:25 to 97:7. Such land typically went for about $14,000 to $15,000 per acre. Tr. 98:10–11 (Blair). Fur-

ther testimony on the pre-Katrina market for clay came from Mike Thibodaux, whose company, ITS, won four of the six clay supply contracts for Task Force Guardian. ITS had negotiated a royalty rate of $1.75 per cubic yard for clay sometime before Hurricane Katrina hit. Tr. 1919:25 to 1920:1; Tr. 1931:8–14 (Thibodaux). However, this arrangement was for clay taken from locations in Mississippi. It had to be barged to locations around New Orleans, including Plaquemines Parish, at some expense to ITS, Tr. 1915:6–9, which would have preferred to use closer Louisiana clay sources if possible. Tr. 1929:25 to 1931:2.

E. *The Corps' Temporary Use of Portions of National Food's Land to Support the Clay Removal Operation*

Mr. Truax provided the only testimony on the value of National Food's property used on a temporary basis by the government to support the clay operation. That property included an easement on 2.16 acres of National Food's land for a road and an easement to use 25.80 acres as a staging area. DX 31–4. Based on a comparison of sales of similar properties in the area, Mr. Truax concluded that National Food's land had a fair market value of about $2,000 per acre. DX 31–38. He found that the road easement deprived National Property of nearly all the value of the 2.16 acres, such that the remainder was worth only $100 per acre. DX 31–52; Tr. 2167:8–24 (Truax).

In assessing the value of the staging area, Mr. Truax treated the government's actions as tantamount to a rental of National Food's property for the duration of Shaw's activity. DX 31–52. He pegged the rental rate at 10 percent of the land's fee value, which he estimated at $2,000 per acre. DX 31–52; Tr. 2168:18 to 2169:13 (Truax). In his view, this amounted to $200 per acre per year, or $5,160 per year for the 25.80–acre staging area.

**PROCEDURAL HISTORY**

National Food filed its complaint in this court on March 9, 2010, and amended its complaint on July 20, 2010. *See* Am. Compl. Its pleadings assert a Fifth Amendment takings claim, alleging that the Corps and its

agent, Shaw, occupied its land and removed its clay without providing just compensation.[9]

Six months after this case was instituted, on September 14, 2010, the government filed a Complaint in Condemnation in the United States District Court for the Eastern District of Louisiana formally taking some of the land at issue in this case. *See* Compl. in Condemnation at 1, *United States v. 46.26 Acres of Land, More or Less,* Civ. No. 10–3062 (E.D.La. filed Sept. 14, 2010).[10]

On September 3, 2010, the government filed a motion to dismiss plaintiff's takings claim, and on September 30, 2010, it filed a motion to stay proceedings. In its motion to dismiss, the government argued that it had no liability under the Fifth Amendment because it had not taken National Food's property; rather, Plaquemines Parish was liable, as it had commandeered entry on plaintiff's land. *National Food & Beverage Co. v. United States,* 96 Fed.Cl. 258, 263 (2010) (*"National Food I"*). In its second motion, the government sought to stay proceedings pending the outcome of the condemnation action it had filed in the Eastern District of Louisiana. *Id.* at 267. Because that condemnation also addresses National Food's property, albeit not the same property as that at issue in this case, the government expressed concern that litigating both suits simultaneously could result in a duplicative award of damages or compensation and divergent outcomes. *Id.*

In an opinion issued December 16, 2010, the court denied both of the government's motions. *See National Food I,* 96 Fed.Cl. at 269. The court found that plaintiff's complaint alleged an "undertaking [that] was overwhelmingly an effort of the federal government, in which the parish had a very limited role." *Id.* at 266. The court also determined "that this court and the district

court [we]re considering distinct and separate takings which address land that overlaps only in part, occurred at different times, and involve[d] entirely separate operative facts." *Id.* at 268.

On October 28, 2011, National Food filed a motion for partial summary judgment, asking the court to (1) find that National Food possessed a compensable property interest, (2) determine that the Corps inversely condemned that property interest, and (3) rule on the methodology for calculating just compensation. *See* Pl.'s Mot. for Partial Summary Judgment that a Federal Inverse Taking of Clay Occurred, Oct. 28, 2011, ECF No. 63. The court granted this motion in part. *See National Food & Beverage Co. v. United States,* 103 Fed.Cl. 63 (2012) (*"National Food II "*). It concluded that there were no genuine disputes of material fact regarding either National Food's possession of a property interest in the clay or the government's taking of the clay through the actions of its contractor, Shaw. *Id.* at 68–69. However, the court remitted the matter of compensation to trial. *Id.* at 70.

The day after the court issued its opinion, the government filed a motion for reconsideration of the court's ruling that National Food possessed a compensable property interest in the clay beneath its lands. *See* Def.'s Mot. for Recons., Jan. 24, 2012, ECF No. 79. The government alleged that it had newly discovered evidence, in the form of a deposition of Mr. Blair taken only days before, which indicated that CLL owned the clay underlying National Food's property. *Id.* at 1; *see also id.* Ex. B. The court held a status conference on the matter on January 25, 2012, and, based on that conference, decided to defer ruling on the government's motion until after trial. Order of Jan. 26, 2012, ECF No. 81.[11]

---

9. In the alternative, National Food alleged that it is the third-party beneficiary of the Cooperation Agreement and thus is entitled to the compensation promised by the federal government in that Agreement. Am. Compl. at 26–27.

10. The government's rationale for the formal condemnation was not readily apparent because it had removed the clay from the land more than three years earlier and had not occupied the land in the intervening time. Seemingly the only ben-

efit the government would obtain from the formal condemnation might be to avoid complying with a backfill ordinance in Plaquemines Parish. *See, e.g.,* Tr. 800:21 to 801:18 (Wood).

11. Shortly thereafter, the court issued formal notice to CLL of this lawsuit pursuant to RCFC 14(b), instructing it to file a pleading if it wished to assert an interest in the litigation. *See* Notice, Jan. 26, 2012, ECF No. 83. The company filed a motion to intervene a week before trial. *See*

The trial began February 27, 2012, and ended on March 7, 2012. A site visit was conducted on March 3, 2012. The parties filed their post-trial briefs in the following months, and the court heard closing arguments on June 28, 2012. A month after closing arguments, the government informed the court that the plat maps it had filed were slightly erroneous. *See* Def.'s Notice, July 27, 2012, ECF No. 135. Apparently Shaw left untouched part of the land subject to the Commandeering Order, while removing clay from an equally large area outside the commandeered boundary. *See id.* Ex. 1, at 1. Consequently this mistake did not actually alter the overall affected acreage or the total number of cubic yards of clay taken by the government. *Id.* Ex. 1, at 2.

## STANDARDS FOR DECISION

 National Food has alleged an inverse condemnation of its land and its clay. Inverse condemnation "is a cause of action against the government to recover the value of property taken by the government without formal exercise of the power of eminent domain." *Moden v. United States*, 404 F.3d 1335, 1342 (Fed.Cir.2005) (citing *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980)). The government is bound by the Fifth Amendment's command that private property shall not "be taken for public use, without just compensation," U.S. Const. amend. V, which requirement constitutes a money-mandating duty that may be enforced in this court through an action brought under the Tucker Act, 28 U.S.C. § 1491(a). *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) ("[I]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." (quoting *United States*

*v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946))).[12]

Because the Corps' contractor, Shaw, occupied National Food's land and removed clay, National Food has claimed a physical, not a regulatory, taking. The court employs "a two-part test to determine whether governmental action constitutes a physical taking." *Estate of Hage v. United States*, 687 F.3d 1281, at 1286 (Fed.Cir.2012). First, the court must ascertain whether the plaintiff possesses a compensable property interest. *Id.* Second, the court must decide whether that property interest was "taken" by the government's action. *Hage*, 687 F.3d at 1285–86 (quoting *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 854 (Fed.Cir.2009)). Assuming that both of these questions are answered in the affirmative, the court then proceeds to determine the value of the property taken.

The plaintiff bears the burden of proving not only that the government took its property, but also of establishing the value of that property. *Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n. 12 (Fed.Cir. 2011) ("It is plaintiffs' burden to establish cognizable property interests for purposes of their takings ... claims." (citing *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212 (Fed.Cir.2005))); *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed.Cir. 2003) (holding that plaintiffs had established that they held vested property interests in the real property at issue); *Banks v. United States*, 102 Fed.Cl. 115, 128 (2011) ("Plaintiffs carry the burden of proving that a taking has occurred justifying the payment of just compensation." (quoting *Loesch v. United States*, 645 F.2d 905, 914 (Ct.Cl.1981) (internal quotations omitted))); *Interstate Cigar Co. v. United States*, 32 Fed.Cl. 66, 71 (1994) ("The burden of establishing the value of the property taken rests upon the claimant."). The plaintiff must make these showings by a

---

CLL's Mot. to Intervene, Feb. 21, 2012, ECF No. 99. Two days later, however, it withdrew its motion and waived all claims relating to the present action. CLL's Notice of Withdrawal of Mot. to Intervene, Feb. 23, 2012, ECF No. 102.

**12.** In pertinent part, the Tucker Act provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon

any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

preponderance of the evidence. *See Banks,* 102 Fed.Cl. at 197.

## ANALYSIS

### A. *Compensable Property Interest*

In determining whether the plaintiff possessed a compensable property interest, the court looks to the laws of the state in which the land is located, here, Louisiana. *See Mildenberger v. United States,* 643 F.3d 938, 948 (Fed.Cir.2011) (citing *Preseault v. United States,* 100 F.3d 1525, 1534 (Fed.Cir.1996) (en banc)).

The government does not dispute that National Food had a property interest in the surface of the 18.3–acre borrow pit prior to the Complaint in Condemnation filed on September 14, 2010. Nor does the government challenge National Food's ownership of the land used by the Corps for a staging area or for access to the pit. Given the terms of the sale in 1999 from CLL to National Food and no evidence of further transactions, the court is satisfied that National Food owned and owns the subject property. Instead, the contested issue centers on the government's claim that National Food has no compensable property interest in the clay underlying its property.

The government's argument hinges on the interpretation of the reservation clause in the deed conveying the original 563 acres from CLL to National Food. *See* PX 19. That clause reserves to CLL "all oil, gas and other materials in or under the property." PX 19–6. The government avers that clay is a material in or under plaintiff's property, and so under the terms of the reservation it belongs to CLL rather than to National Food.[13] Plaintiff argues for a less expansive understanding of the phrase "other materials." It contends that the term refers to materials similar to oil or gas, *i.e.,* other fugacious natural resources.

The court agrees with the government that, as a purely technical matter, clay is indeed a material. But under Louisiana law, that marks only the beginning of the inquiry,

not the end. This principle is amply demonstrated by the decision of the Louisiana Supreme Court in *Holloway Gravel Co. v. McKowen,* 200 La. 917, 9 So.2d 228 (1942). That case centered on whether the conveyor of a property retained ownership of underlying sand and gravel when the deed contained a clause reserving "mineral, oil and gas rights." *Id.* at 232. The court did not concern itself with whether sand and gravel were properly classified as minerals. Rather, "[t]he primary question for decision [was] whether, *if it be conceded that sand and gravel are minerals,* it was the intention of the parties that they should be excepted from sale." *Id.* (emphasis added); *see also River Rouge Minerals, Inc. v. Energy Res. of Minn.,* 331 So.2d 878, 881 (La.Ct.App.1976) (holding that solid minerals such as lignite coal were not covered by a reservation clause for oil, gas, and minerals).

On its face, the contract is ambiguous whether clay was intended to be included in the reservation clause. Mr. Blair testified that the clause was specifically drafted so as to ensure his company's continued ownership of the clay deposits. Tr. 101:3–14. If so, CLL's lawyers went about expressing this notion in a very obtuse and arcane manner. *Cf.* Tr. 115:12–14 (Blair) ("[I]n retrospect I wish ... that our lawyers had worded it differently."). Instead of stating its intent plainly, CLL used a generic term ("materials") for another generic term ("minerals") in a standard reservation clause. Tr. 102:1–4 (Blair). Mr. Blair claims that this substitution was so "very, very unusual" that an experienced attorney was bound to notice it. Tr. 101:19. At trial, however, plaintiff demonstrated that it was not unique by producing an earlier and different deed of sale from CLL that used the same phrase. PX 372–4; *see also* Tr. 121:1–17 (Blair).

The circumstantial evidence strongly suggests that there was no mutual intent to exclude clay from the sale. Certainly, National Food did not understand the reservation clause to have such a sweeping scope. Although at trial Mr. Nguyen could not recall

---

**13.** The government can raise and pursue this defense even though CLL has waived all claims related to this action. *See supra,* at 690–91 n. 11.

his exact understanding of the reservation clause from when he first read it thirteen years ago, *see* Tr. 62:22–25; 45:19–23,[14] he did testify that he purchased the land to serve as a homestead and a possible factory site, Tr. 44:18–25. From this one can readily infer that Mr. Nguyen did not believe that the reservation clause included literally all the soil on the land; his purpose for buying the land would be completely defeated if CLL could, at any time, move into any portion of his land and open a full-scale borrow pit. *See Holloway Gravel*, 9 So.2d at 233 ("We do not think it can be seriously contended that it was in the contemplation of [the buyer] that he might at any time be deprived of the use of the land for the purposes for which he had purchased it by the mining of sand and gravel ... for the benefit of his vendors."); *see also Cumberland Mineral Co. v. United States*, 513 F.2d 1399, 1402 (Ct.Cl.1975) ("[I]f the plaintiff ... were the owner of the sandstone and clay in the ... land and were to exercise its right of ownership by removing all of these materials, about the only thing that would be left for the [purchaser] would be a vast chasm, thus wholly defeating the purpose of the ... transaction.").[15]

■ Faced with an ambiguous term and differing interpretations by the parties, this court is guided by two salient principles. The first is the doctrine of *ejusdem generis*. Under this canon of construction, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." Black's Law Dictionary 594 (9th ed. 2009). While this canon of construction applies in a variety of contexts, Louisiana courts have accorded it primacy in interpreting mineral reservations. *See Continental Grp., Inc. v. Allison*, 404 So.2d 428, 431 (La.1981). In a typical reservation of "oil, gas, and other minerals," the latter term "necessarily must be read in connection with the things [preceding it] ... and should be confined to things of that nature." *Holloway Gravel*, 9 So.2d at 232–33. Otherwise, the specific examples would serve no purpose, because they would be encompassed by the general term. *Id.* at 233 ("Obviously, [the drafter] used the terms 'oil and gas' ... for some purpose, and what could he have intended if his purpose was not to limit or restrict the application of the more comprehensive term?").

■ In applying the *ejusdem generis* canon, Louisiana courts typically look to the physical form of the material in question to determine whether it falls within the reservation clause. *See River Rouge*, 331 So.2d at 881 (determining that lignite coal was not covered by the reservation clause "on the basis of the physical properties of the mineral—gas or liquid as opposed to solid—rather than [its] elemental composition."); *Huie Hodge Lumber Co. v. R.R. Lands Co.*, 151 La. 197, 91 So. 676, 677 (1922). One reason for drawing this distinction is that extracting fugacious resources (such as oil or gas) is far less intrusive to the purchaser than removing solid materials (such as gravel, coal, or clay). *See River Rouge*, 331 So.2d at 879–80. The former can be accomplished "without great disturbance of the surface owner's enjoyment of the property," by drilling a narrow bore to a liquid or gaseous reservoir beneath the land. *Id.* at 879. By contrast, the latter "result[s] in the utter destruction of [the] surface." *Holloway Gravel*, 9 So.2d at 233. When a purchaser agrees to permit the seller to retain oil, gas, and other substances, the purchaser rightfully expects that he or she will nonetheless be able to enjoy the surface of the property. *See id.*

A second guiding principle applied by Louisiana courts in interpreting reservation clauses is to construe an ambiguous or confusing clause against the drafter. *See Huie Hodge Lumber*, 91 So. at 678 (quoting *Detlor v. Holland*, 57 Ohio St. 492, 49 N.E. 690 (1898)); *Holloway Gravel*, 9 So.2d at 233. In

---

14. At the time he gave his testimony at trial, Mr. Nguyen was 90 years of age. Tr. 41:16–22.

15. The initial interaction between Mr. Nguyen and the Corps' contractor, Shaw, shows that Mr. Nguyen found mining to detract from his enjoyment of the property. The encounter with the contractor resulted in gunshots, dead livestock, and police involvement. *See* Tr. 65:2–14 (Nguyen). And, when Shaw had ceased mining, Mr. Nguyen was left with an 18–acre lake or pond in the midst of his property.

*Holloway Gravel*, the court noted reprovingly that "[i]t would have been a very simple matter, granting that all the parties agreed to the reservation of sand and gravel, to have used those words in addition to the words 'mineral, oil and gas rights.'" *Holloway Gravel*, 9 So.2d at 234. Yet the seller, who had insisted on including a mineral reservation clause, not only neglected to append sand and gravel to the provision but failed to discuss the substances during negotiations. *Id.* Consequently, the court limited the clause's application to fugacious resources. *Id.*

■ Applying these principles derived from Louisiana law to the facts of this case, this court concludes that the reservation clause in the 1999 deed of sale covered only fugacious resources. First, the *ejusdem generis* principle applies here with as much force as it did in *Huie Hodge*, *Holloway Gravel*, and *River Rouge*. CLL did not simply reserve all materials but rather withheld "oil, gas, and other materials." PX 19–6. In keeping with Louisiana law, the term "other materials" in this clause "necessarily must be read in connection with the things [listed before it] ... and should be confined to things of that nature." *Holloway Gravel*, 9 So.2d at 232–33. The government's attempt to distinguish the clause in this case is unavailing. The government places inordinate weight on the fact that CLL used the term "materials" instead of "minerals," as is customarily done in such reservation clauses. Yet this distinction does not alter the fact that CLL "employed the terms 'oil and gas'" in such a manner that could have "no other purpose than to define more particularly the [other materials] reserved." *Id.* at 233. Most notably, oil and gas can be extracted with minimal disruption to the landowner's enjoyment of the surface. The same cannot be said of clay mining.[16]

Alternatively and additionally, the reservation clause should be construed against CLL as the drafter. If CLL wanted to retain ownership of the land's clay deposits, "it

would have been a very simple matter ... to have used [the word 'clay'] in addition to" the phrase "oil, gas, and other materials." *Holloway Gravel*, 9 So.2d at 234. Yet the contract omits any mention of clay, nor did Mr. Blair ever discuss the substance with Mr. Nguyen. Tr. 43:8–14 (Nguyen); *cf. Holloway Gravel*, 9 So.2d at 233.

Because the clause did not reserve ownership of clay to CLL, National Food became the owner of any clay deposits underlying the 563 acres it purchased from CLL. Thus, National Food has a compensable property interest in the 383,000 cubic yards of clay removed by Shaw, the Corps' contractor. The court accordingly reaffirms its prior ruling in *National Food II* that National Food owned the clay and denies the government's motion for reconsideration of that decision.

### B. *The Taking*

■ Having found that National Food had a compensable property interest in the clay, the court must "determine whether the governmental action at issue amounted to a compensable taking of that property interest." *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed.Cir.2004) (citing *Chancellor Manor v. United States*, 331 F.3d 891, 902 (Fed.Cir.2003)). The court settled this issue when it granted National Food's motion for partial summary judgment on the government's liability. *See National Food II*, 103 Fed.Cl. at 69–70. No party disputes that the government's agent occupied plaintiff's property for nine months, during which time it extracted some 380,000 cubic yards of clay. This act was unmistakably "a direct government appropriation or physical invasion of private property," for which the United States owes just compensation. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).

■ One detail remains unresolved: the timing of the taking. The government argues that the taking occurred on January 26,

---

16. Carried to its fartherst reach, the government's interpretation of the reservation clause would border on the absurd. According to the government, CLL owns "quite literally ... all matter in or under the property." Def.'s Post–Trial Br. at

24. If this understanding of the term were given effect, nothing prevented CLL from marching into the land the day after the sale and removing all of the soil to whatever depth it chose from the entire 563 acres.

2006, when the President of Plaquemines Parish signed the Commandeering Order. Def.'s Post–Trial Br. at 11. National Food, on the other hand, claims that the date of taking should be reckoned by when Shaw entered upon its land and began excavating the clay, in June 2006. Pl.'s Post–Trial Br. at 15. The date of taking will determine the date of valuation of the property and the interest due to National Foods. *See United States v. Dow*, 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) ("It is [the taking of possession] which ... fixes the date as of which the land is to be valued and the [g]overnment's obligation to pay interest accrues.")

■ A physical taking begins when the government's action "interferes with or substantially disturbs the owner's use and enjoyment of the property." *Alder v. United States*, 785 F.2d 1004, 1008 (Fed.Cir.1986) (quoting *Pete v. United States*, 531 F.2d 1018, 1031 (Ct.Cl.1976)); *see also Petro–Hunt, L.L.C. v. United States*, 90 Fed.Cl. 51, 59 (2009). Typically this is the date when the government actually takes possession of the land or other property. *See, e.g., United States v. Dow*, 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). It is possible, however, that the sovereign's activity may constitute a taking even though its agents have not yet entered upon the property. *United States v. 15.65 Acres of Land*, 689 F.2d 1329, 1334 (9th Cir.1982). To rise to the level of a taking, however, such interference must be "so complete as to deprive the owner of all or most of his interest in the subject matter." *R.J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct.Cl.1966) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)).

■ Here, the government did not substantially disturb National Food's use of the property until June 2006, when Shaw entered the land and began removing clay.[17] The

Commandeering Order by its own terms did not actually seize National Food's property. Rather, it merely commandeered entry onto the property. In addressing a comparable commandeering order issued by a different parish after Hurricane Katrina, a Louisiana district judge noted that such orders are premised on a declaration of a local disaster or emergency. *See Olivier Plantation, L.L.C. v. Parish of St. Bernard*, No. 109–272, slip op. at 7, 2012 WL 1379464 (La.Dist.Ct. Mar. 12, 2012). Citing La.Rev.Stat. Ann. § 29:727, the Louisiana district judge ruled that a commandeering order had a limited duration: "The rights authorized and effective with the declaration of the emergency persist[ ] only as long as the situation upon which the emergency is declared continue[s], but not longer than thirty (30) days after the declaration, unless further affirmative action [is taken by] the parish president to extend the disaster declaration." *Id.*, slip op. at 9.[18] Correlatively, the scope of the rights commandeered are limited in nature:

> Commandeering of immovable property evidently purports to assign the landowner[']s right of use ... to the public benefit, including the right of entry on the commandeered lands for a limited period of time. The act of commandeering immovable property is not a right in or to title of the land, nor is the owner divested of title by the commandeering order, although his right of use is suspended during the duration of the emergency declaration, when the use of the private property is applied for public benefit.

*Id.* As a result, in *Olivier Plantation*, "the commandeering order was only effective to impose on [p]laintiff's property a temporary right of occupancy, entry[,] and access in connection with public use for 'the repair, rehabilitation[,] and maintenance of ... levees.' " *Id.*, slip op. at 10. So too here. After the Commandeering Order was issued,

---

17. Prior to that time, the Corps and its agents entered upon the property only for limited purposes, such as undertaking survey work or making additional borings. *See* Tr. 1811:4 to 1812:9 (Thompson); Tr. 1856:1–5 (Pilie). However, nothing in the record suggests that these visits interfered with National Food's use of the land, much less constituted possession.

18. The evidentiary record does not indicate that the emergency declaration in this instance was ever extended by the President of Plaquemines Parish.

National Food retained ownership of the land—and the clay—and could use it in any manner it pleased so long as it did not "interfer[e] with or abridg[e] the rights" marked out in the Commandeering Order. PX 91–2. It was only in June 2006, when Shaw began physically removing the clay, that National Food lost its right to the substance.

The government argues that the Commandeering Order ought to be recognized as triggering the taking because it prohibited National Food from removing clay from its land. *See* Def.'s Post–Trial Br. at 11. Yet the government's position ignores the temporary nature of the Commandeering Order's imposition. As the court observed in its prior opinion in this case, the order effected merely "a temporary taking of access to the clay deposit." *National Food I*, 96 Fed.Cl. at 264. Later, "the Corps' physical removal of clay effected a permanent taking of the excavated material." *Id.* Moreover, during the interval between issuance of the Commandeering Order and Shaw's arrival, National Food was free to continue to use the land as pasturage. The Commandeering Order by its own terms did not deprive National Food of all or even most of its interest in the property. *See R.J. Widen*, 357 F.2d at 993. The taking occurred later, on June 1, 2006, when Shaw occupied the land and began removing the clay.

### C. *Just Compensation*

■■■ Having found that National Food has satisfied the pertinent two-part test for takings, *see Hage*, 687 F.3d at 1285–86, the amount of just compensation must be resolved. Courts have almost universally treated "just compensation" as the fair market value of property on the date it is appropriated. *See, e.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 734, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (quoting *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984)). "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *Kirby Forest Indus.*, 467 U.S. at 10, 104 S.Ct. 2187 (quoting *United States v. 564.54 Acres*

*of Land*, 441 U.S. 506, 511, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979)). The overarching aim of just compensation is to put the owner "in as good a position pecuniarily as if his property had not been taken." *Reunion, Inc. v. United States*, 90 Fed.Cl. 576, 584 (2009) (quoting *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).

1. *The removed clay.*
a. *Applicability of the "no government demand" rule.*

■■■ The Corps' levee projects markedly affected the clay market in southern Louisiana after Hurricane Katrina. Although fair market value remains the touchstone for just compensation in eminent domain cases, "strict adherence to the criterion of market value may involve inclusion of elements which, though they affect such value, must in fairness be eliminated in a condemnation case." *United States v. Miller*, 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336 (1943). One such element is the price enhancement attributable to the government's special demand for the property or product. *See United States v. Cors*, 337 U.S. 325, 333, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949) ("It is not fair that the government be required to pay the enhanced price which its demand alone has created."); *see also United States v. Fuller*, 409 U.S. 488, 492, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973). Consequently, "governmental demand for property should be disregarded altogether in assessing the fair market value of that property." *United States v. 320.0 Acres of Land, More or Less*, 605 F.2d 762, 787 n. 32 (5th Cir.1979).[19]

■■■ The application of this "no government demand" principle is relatively straightforward in the context of construction materials. In assessing just compensation, the court cannot uncritically accept the market's valuation for rock, gravel, clay, or similar resources. Rather, it must strive to discern what impact the government's need has had on the demand for, and price of, the substance and then subtract that component from the going price. *United States v. Whitehurst*, 337 F.2d 765, 772 (4th Cir.1964) (re-

---

**19.** For a discussion of the rationale for this rule, see *320.0 Acres of Land*, 605 F.2d at 782–83.

versing a condemnation award because the "record [was] replete with testimony relying on the sales of materials to the [g]overnment, and the [adjudicatory body] made no finding that it excluded or ignored such sales."). This is true both when the court is determining the land's highest and best use and when it is computing the overall value of the property taken. *See J.A. Tobin Const. Co. v. United States*, 343 F.2d 422, 424–25 (10th Cir.1965) (finding that the highest and best use of condemned land was not as a quarry because there was no market for stone apart from the government project); *United States v. 158.76 Acres of Land, More or Less*, 298 F.2d 559, 560 (2d Cir.1962) ("[T]he enhancement principle was violated by the refusal to exclude evidence of gravel sales directly connected with the government project."); *see also United States v. 22.80 Acres of Land, More or Less*, 839 F.2d 1362, 1365 (9th Cir. 1988); *United States v. 124.21 Acres of Land, More or Less*, 458 F.2d 568, 570–71 (8th Cir.1972); *United States v. Rayno*, 136 F.2d 376, 378–79 (1st Cir.1943).

 National Food has argued strenuously that the "no government demand" rule should not apply in this case. First, it claims that the bulk of the government's demand may be legitimately considered under the scope-of-the-project rule. This rule applies when (1) the government initiates a project, (2) the announcement of that project increases the value of surrounding properties, and (3) the government subsequently condemns a person's land to complete the project. Under the project-scope principle, if that person's property was not within the original scope of the project, he would be entitled to the increase in value attributable to his property's proximity to the project. *See United States v. Reynolds*, 397 U.S. 14, 16–18, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970).

National Food argues that the lion's share of clay demand came from the Hundred–Year Protection project, whereas its property was condemned for the Task Force Guardian project.

 The court does not regard the project-scope rule as the guiding principle in this case. More pertinent, rather, is the broader doctrine that the government is not required to pay extra for property simply because it has great need of it. Courts have treated the project-scope rule as a special case of this larger "no government demand" principle. *See Cors*, 337 U.S. at 333, 69 S.Ct. 1086 ("[T]hese exceptions [including the project-scope rule] are merely illustrations of a principle which excludes enhancement of value resulting from the government's special or extraordinary demand for the property."); *320 Acres*, 605 F.2d at 786 ("[The project-scope rule] is essentially yet another application of the 'no value attributable to [g]overnment demand' principle."); *124.21 Acres*, 458 F.2d at 570 ("The enhancement principle extends beyond the scope-of-the-project situation."). The project-scope doctrine attempts to distinguish between "value attributable to [g]overnment demand and the value of [g]overnment-conferred benefits." *320.0 Acres*, 605 F.2d at 787 (internal quotation marks omitted). It "excludes compensation for the former but commands compensation for the latter." *Id.* That distinction is not in play in this case, however. Neither Task Force Guardian nor the Hundred–Year Protection program confer special benefits that would influence the price of plaintiff's clay—instead, the main factor affecting the value of National Food's property is the Corps' extraordinary need.[20]

Second, National Food argues that applying the "no government demand" rule would offend the non-discrimination principle artic-

**20.** Courts have traditionally applied the project-scope rule where the government condemned the citizen's land *after* the project began. *See Reynolds*, 397 U.S. at 16–17, 90 S.Ct. 803 ("[T]he development of a public project may also lead to enhancement in the market value of neighboring land that is not covered by the project itself. And if that land is *later* condemned, . . . the general rule of just compensation requires that such enhancement in value be wholly taken into account.") (emphasis added); *Miller*, 317 U.S. at 376, 63 S.Ct. 276 ("If a distinct tract is condemned, . . . other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the [g]overnment, at a *later* date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity."). Here, the government took National Food's clay before the Hundred–Year Protection project was even confirmed. *See* Tr. 153:8–19 (Scoville); Tr. 535:15–18 (Herr).

ulated in *United States v. Commodities Trading Corp.*, 339 U.S. 121, 127–28, 70 S.Ct. 547, 94 L.Ed. 707 (1950). *See* Pl.'s Post–Trial Br. at 16–23. National Food contends that it ought to enjoy the spike in clay prices prompted by the Corps' emergency demand because other landowners received such a premium when they sold their clay voluntarily to contractors.[21] The facts of *Commodities Trading* are readily distinguishable from those of this case.[22] Much more analogous are the numerous cases involving condemned borrow pits and mineral rights, cited *supra*, which state categorically that government demand must be ignored when calculating just compensation. Plaintiff cannot simply dismiss the weight of these precedents, as well as their progenitor *Cors*, by invoking a general principle of non-discrimination. Indeed, courts have accepted that the "no government demand" principle can impose privations on a condemnee noticeably greater than merely denying them a windfall granted to others. *See United States v. Michoud Indus. Facilities*, 322 F.2d 698, 709 (5th Cir. 1963) ("While this rule may well work a hardship to a tenant who must relocate … and who must unquestionably pay for the space later rented by him at … an inflated [rate], it seems clear that the Supreme Court has settled this issue in such manner as to be binding on this [c]ourt." (citing *Cors*, 337 U.S. at 333, 69 S.Ct. 1086)).

Lastly, National Foods appears to argue that, because the Corps voluntarily participated in the private market for clay, it must pay condemnees the higher price caused by those activities. *See, e.g.*, Pl.'s Post–Trial Br. at 22. It has cited no precedents to support this novel position. Notably, a number of appellate courts have applied the "no government demand" rule in situations where the government had previously been active in the market in its non-sovereign capacity. *See United States v. Weyerhaeuser Co.*, 538 F.2d 1363, 1366 (9th Cir.1976) (holding that the government's prior payments to a landowner for use of its road could not be considered in determining the fair market value of that road); *United States v. Michoud Indus. Facilities*, 322 F.2d at 703–04 (ruling that a valuation commission in a condemnation action improperly considered the government's earlier leases in establishing the fair market value of a building); *Carlstrom v. United States*, 275 F.2d 802, 808–09 (9th Cir.1960) (refusing to consider evidence of rents paid by government for leases which "had been entered … out of government necessity").

The court concludes that the "no government demand" rule must be applied in this case. In calculating just compensation for the clay removed from the borrow pit, the court must sift through the market data and

21. During trial, the parties sparred over whether National Food could have sold its clay to a contractor for the Hundred–Year Protection project. The government argues that National Food's clay would not have met the criteria established by the Corps for qualifying clay. This contention is not well taken because the government indeed accepted as satisfactory clay embedded in a large number of acres of National Food's land. Nonetheless, this dispute is not material to determining just compensation in this instance because under the "no government demand" rule, the court must omit the price component attributable to the Corps' extraordinary need, regardless of whether National Food's clay met the standards for the later and larger project.

22. The condemnee in *Commodities Trading* had been hoarding pepper in the hopes of making a windfall when wartime price controls on the substance would be lifted. 339 U.S. at 122–23, 70 S.Ct. 547. It argued that just compensation should not be the pepper's ceiling price but rather its "retention value," *i.e.*, the price the substance would have fetched if the owner had retained it until the price controls were lifted. *Id.*

at 123, 70 S.Ct. 547. In rejecting this claim, the Court noted that only the rich would be able to avail themselves of this rule. *Id.* at 127, 70 S.Ct. 547. The less fortunate, who would either consume the pepper or sell it during the course of the war, could not claim to be stockpiling the substance and consequently would be entitled to only the price ceiling. *Id.* Moreover, the rule would also discriminate against those, who motivated out of patriotism, voluntarily sold their pepper stockpiles to the government. *Id.* The court worried that the promise of an enhanced retention value would thus discourage commodity brokers from selling to the government and so place "[a] premium … on recalcitrance in time of war." None of these considerations arise in the present case. Application of the "no government demand" rule here would not require the court to treat two condemnees differently based on whether they could afford to stockpile clay. Nor does it encourage clay-owners to withhold their supplies from market in anticipation of receiving a higher value from a taking.

filter out those data points attributable to the Corps' levee reconstruction efforts. This task may not be easy, but such is the mandate given by *Cors* and its progeny.

b. *The highest and best use of National Food's property at issue.*

■■■ In assessing fair market value, the court looks to the highest and best use of the property at issue. *See Board of Cnty. Supervisors of Prince William Cnty., VA v. United States,* 276 F.3d 1359, 1364 (Fed.Cir. 2002) (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). To establish the highest and best use of the property, a party must show a "reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future." *Id.* at 1365 (citing *United States v. 341.45 Acres of Land,* 633 F.2d 108, 111 (8th Cir.1980)). The court does not confine its inquiry to "the use to which the property [was] devoted" at the time of the taking, but also considers "that use to which it may be readily converted." *United States v. Powelson,* 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *see also Mississippi & Rum River Boom Co. v. Patterson,* 98 U.S. 403, 408, 25 L.Ed. 206 (1878) (holding that highest and best use should be "viewed not merely with reference to the uses to which [the land] is at the time applied, but with reference to the uses to which it is plainly adapted").

■■■ National Food claims that the best use of the land subject to the Commandeering Order was as a clay pit, which is how the Corps exploited the property after taking possession of it. The government argues that its highest use was as pasturage, which is how plaintiff used the land prior to the taking. Manifestly, there is no question that National Food's land was physically adaptable to serve as a borrow pit. The primary issue before the court is whether there was a demand for use of the land as a clay source in the reasonably near future, if one ignores the Corps' own need for the material.

The evidence suggests that the market for clay in Plaquemines Parish was such that the land's best and highest use was as a borrow pit. The court heard testimony from witnesses with direct experience buying and selling clay, all of whom indicated that there was a market for clay apart from the demand generated by the Corps' levee repairs. An official from Shaw explained that his company had used clay for various projects that were not connected to the Corps. Tr. 157:5–9 (Scoville). Mr. Howell testified that thirty to forty percent of his clay sales were to private entities or local governments. Tr. 904:16–19. CLL sold clay to up until 2001, well before Hurricane Katrina hit and the concomitant emergency demand arose for the material. Tr. 95:5–11; Tr. 96:12–17 (Blair). And Mr. Thibodaux testified that clay had commercial value apart from emergency levee repairs, as he secured contracts for clay in nearby Mississippi before the hurricane struck. Tr. 1919:25 to 1920:1; Tr. 1931:8–14. This clay went to a variety of projects, including as partial support for piers and abutments attendant to locally-funded bridges, as landfill caps and liners, and for private levees. Tr. 157:5–22 (Scoville); Tr. 904:3–15 (Howell); Tr. 1516:16 to Tr. 1517:5 (Herr).

Although the government's experts did testify that there was no substantial demand for clay outside the Corps' levee projects, DX 28–12 (Lizak Report); Tr. 2129:1–3 (Truax), this testimony was contradicted by the first-hand experience of participants in the clay market and suffered from methodological shortcomings. Mr. Lizak focused on the price per cubic yard of clay; on the question of most profitable use, he simply "followed the [government's] directive to assume that the highest and best use of the subject property was as a clay borrow pit." DX 28–12. Mr. Truax appears to have based his assessment of the highest and best use as pasture-land at least in part on comparable sales of land in the area. Tr. 2133:15 to 2134:4. But as Mr. Lizak explained, the sales comparison methodology may be unreliable for determining the market value of a clay deposit. *See* DX 28–15 (Lizak Report) ("The sales approach has considerable limits or problems when applied to mineral transactions because timely mineral transactions are rare, because it is difficult to determine the actual sales

price for minerals, and because mineral transactions rarely meet all of the comparable sales criteria."). In any event, the court is satisfied that clay was a valuable commodity in the southern Louisiana at the time of the taking, even ignoring the Corps' special demand. National Food has shown its land was both physically adaptable for use as a clay pit and that there was a demand for such use around the time of the taking. *See Board of Cnty. Supervisors,* 276 F.3d at 1365.

#### c. The proper measure of the compensation.

■ The next question is how the court ought to quantify compensation for the taking. National Food argues that the proper measure is the royalty rate it would have received on the market, multiplied by the number of cubic yards extracted by the Corps' contractor. The government counters that the appropriate yardstick is the fee value of the land, which presumably would take into account the presence of clay deposits.

■ The government is correct that courts are often reluctant to calculate the value of a mineral deposit by "estimating the number of tons in place and then multiplying the tonnage by a unit price per ton." *United States v. 91.90 Acres of Land,* 586 F.2d 79, 87 (8th Cir.1978). Instructively, however, an exception to the disinclination to rely on volumetric measurement "occurs where the mineral deposit itself is the property being condemned," for "[i]n such a case the deposit is treated as merchandise rather than land." 4 Nichols on Eminent Domain § 13.14[3]; *see also United States v. 22.80 Acres of Land, More or Less,* 839 F.2d 1362, 1364 n. 2 (9th Cir.1988) (approving a cubic-yard basis of compensation where "the government is taking the [material] itself, [and] not the overlying parcel of land").[23]

The exception applies in this case, given the factual setting. The cases relied upon by the government all involve the incidental taking of undeveloped mineral deposits on land. *See United States v. Sowards,* 370 F.2d 87, 89 (10th Cir.1966) (government took land which had a coal deposit which was essentially unmarketable); *Cloverport Sand & Gravel Co., Inc. v. United States,* 6 Cl.Ct. 178, 181 (1984) (mineral deposit taken when government's dam flooded condemnee's property); *Foster v. United States,* 2 Cl.Ct. 426, 449–50 (1983) (land purchased for military base had dolomite deposits which had been reserved by plaintiffs' predecessors-in-interest, and the government precluded a mineral lessor from quarrying on one tract); *United States v. 13.40 Acres of Land,* 56 F.Supp. 535, 536 (N.D.Cal.1944) (government had initially sought the rock on the land but eventually filed a condemnation action for the fee title). In this case, however, the government in 2006 was not interested in National Food's land but rather the clay embedded in it. Under the terms of the Commandeering Order, the government did not take fee title to the land at all; rather, it was granted temporary access to the property. PX 91–2. Although the stated purpose of the right of entry was to "obtain borrow," *id.,* actually excavating clay was beyond the scope of the Commandeering Order. That the government removed and took the clay makes this case more analogous to *22.80 Acres,* where the government took a large quantity of rock from plaintiff's land instead of taking the land itself. 839 F.2d at 1364 n. 2. In that situation, the appellate court saw no reason to disturb the trial court's award of just compensation based on the volume of material removed. *Id.* at 1362. Similarly, this court believes that the best measure of the taking is not the value of the land per acre, but rather the value of the removed clay per cubic yard.

#### d. The fair market value of clay in Plaquemines Parish.

The court's salient responsibility is to define just compensation for the taking of 383,-871 banked cubic yards of clay from National

---

**23.** The Supreme Court accords trial courts discretion in selecting a methodology for gauging just compensation. *See, e.g., United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195 (1949) ("Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules."); *Cors,* 337 U.S. at 332, 69 S.Ct. 1086 ("The Court in its construction of the [takings clause] has been careful not to reduce the concept of 'just compensation' to a formula.").

Food's land in Plaquemines Parish in June 2006, absent the Corps' demand. The parties each presented a pair of witnesses whose primary purpose was to assign a dollar amount for this purpose. Perhaps unsurprisingly, their estimates ran the gamut from $15.00 per cubic yard to essentially zero. It falls upon the court to assess the reliability of each witness's valuations by weighing "the validity of the appraiser's premises, procedures, and theories; the soundness of his or her factual determinations; the comparisons he or she made; the methods the appraiser has followed and the formulae the appraiser has applied." 4 Nichols on Eminent Domain § 13.01[6].

As a preliminary matter, this task is made difficult by the absence of any expert testimony directly on the price of clay absent the Corps' demand. The government experts steadfastly insisted that there was no such market for clay prior to Hurricane Katrina, despite the aforementioned evidence to the contrary. DX 28–12 (Lizak Report); Tr. 2129:1–3 (Truax). The plaintiff's witnesses, on the other hand, did nothing to exclude the Corps' demand from their proposed fair market values—both relied on the post-Katrina price of $25 a cubic yard as their starting points. See PX 316–12 (Wood Report); Tr. 895:13–17 (Howell). Testimony from a number of witnesses, including the parties' experts, nonetheless provided evidence relating to a fair market value for clay that omits the Corps' extraordinary need.

Dr. Wood's methodology was to start with the supply contract price for clay ($25 per cubic yard), which necessarily reflected the government's demand, and then to subtract the costs of excavation ($4.00 to $5.00), transportation ($5.80), and entrepreneurial profit ($1.50 to $2.00), leaving a royalty of up to $15.00. See Tr. 750:2–24; Tr. 859:16–21. While Dr. Wood has impressive academic credentials in the field of markets, e.g., Tr. 708:13–20, his experience with real estate appraisal—and in particular mineral appraisals—was limited, Tr. 721:19 to Tr. 722:3; Tr. 723:1–3. Correspondingly, though his opin-

ion in this case presents a cogent theoretical model of the clay market, it appears largely divorced from the realities on the ground.

Dr. Wood's methodology had a relatively hypothetical foundation that departed from the "three generally accepted valuation methods for determining fair market value in condemnation procedures": sales comparison, reproduction cost, and income capitalization. 4 Nichols § 13.01[10]; cf. Tulare Lake Basin Water Storage Dist. v. United States, 59 Fed.Cl. 246, 260 (2003). Under cross-examination, Dr. Wood revealed that crucial components of his valuation (i.e., the costs of excavation, transportation, and entrepreneurial fee) were derived entirely from a ten- to fifteen-minute phone conversation with plaintiff's other main valuation witness, Mr. Howell. Tr. 782:12–23. He also admitted that he did not know whether the removal of National Food's clay required any additional preparatory measures (such as discing, pumping, backfilling, etc.), nor how much it would cost Shaw to perform these measures. See Tr. 793:22 to 801:6; Tr. 819:12–25. Dr. Wood never attempted to find out whether landowners were actually receiving royalties within the range of his $8.00 to $15.00 estimate. Tr. 803:9–13. And in fact, none of the royalties disclosed during the trial were within his range.[24] Given these weaknesses in his analysis, the court does not regard Dr. Wood's valuation as reliable.

Similar problems adversely affected Mr. Howell's estimate. He employed a methodology nearly identical to that employed by Dr. Wood and arrived at an estimate of $12.50 per cubic yard. Tr. 908:3. Yet he himself never paid a royalty near this amount. Tr. 900:21–23. Mr. Howell attempted to defend his estimate by explaining that his method "didn't say that this is [the royalty] the landowner received" but rather "this is what the landowner could receive." Tr. 591:8–10 (emphasis added). This approach does not aid the court. In a condemnation case, the court is charged with finding "the amount that a willing and informed buyer would pay a willing and informed seller in

---

24. Mr. Howell had initially promised to pay one property-owner $8.00 per cubic yard for clay. The owner agreed to subsequent price reduc-

tions, however, such that Mr. Howell paid an average of about $7.45 per cubic yard. Tr. 1150:20–21 (Howell).

an arm's length transaction," not the most advantageous price possible to the seller. *Innovair Aviation, Ltd. v. United States,* 83 Fed.Cl. 498, 500 (2008).

Nor does the court find Mr. Howell's alternative estimate to be of much greater value. Mr. Howell offered his contract with White Oak Realty as a point of comparison to suggest that the royalty for that clay, $7.45 per cubic yard, represents the fair market value for clay on National Food's property. Tr. 592:12–22; 593:9–18. The court would be hesitant to accept a single data point as representative of fair market value under any circumstances, but it is particularly reluctant to do so here. Mr. Howell did not satisfactorily explain why that specific contract captures the fair market value of plaintiff's clay better than any of the other contracts he has—including his agreement with National Food to buy its clay at approximately half the price he agreed to pay White Oak Realty. *See* PX 231. Indeed, the Idlewild contract seems particularly ill-suited to represent the market because it is an outlier—its royalty rate is the highest Mr. Howell has paid for clay in southern Louisiana. Tr. 900:21–25.

Mr. Truax's estimate offered on behalf of the government is, if anything, even less helpful. He proffered an estimate of $2,000 per acre for the land itself, assigning no value to the clay and wholly ignoring that the government in 2006 took clay, not the land.

Of the four primary witnesses, Mr. Lizak offers the most useful information regarding the market price of clay. His background and credentials are well suited to the task. He has had extensive experience evaluating mineral interests and has been certified as an expert in the field by numerous courts. *See* Tr. 2198:15 to 2205:5. Most important, however, was the thoroughness of his research and methodology. Rather than basing his estimate on an abstract model of the clay market or on a single contract royalty, Mr. Lizak obtained royalty information from more than twenty market actors. *See* DX 28–28. He also adjusted some rates and omitted others which in his professional judgment did not accurately reflect the market,

explaining in reasonable detail why he reached those adaptations. 2271:1 to 2272:8.

The chief omission from Mr. Lizak's analysis is a failing to include Evenstar's contracts with White Oak Realty and National Food. DX 28–19. The reason behind this omission is understandable, however. Mr. Lizak was not certain whether the National Food contract had been fully executed, Tr. 2226:13 to 2227:4, and he did not receive a copy of the White Oak Realty contract until after he had submitted his report, Tr. 2287:4–11. Considered overall, Mr. Lizak's analysis was helpful, and in general the court regards Mr. Lizak's broad range of $2.00 to $4.00 per cubic yard as a starting point to determine the fair market value of National Food's clay. *See* DX 28–21; Tr. 2276:9–11.

The court also heard testimony on the pre-Katrina price of clay from two other sources. Mr. Blair testified that CLL sold clay at a price of $14,000 to $15,000 per acre. Tr. 98:10–11. The relevance of this rate to the taking of National Food's clay is questionable, however. These sales all happened five years or more before the Corps took possession of National Food's land. Tr. 98:7–11. Additionally, Mr. Thibodaux stated that his company, ITS, negotiated a royalty rate of $1.75 per cubic yard before Hurricane Katrina. Tr. 1919:25 to 1920:1; Tr. 1931:8–14. This rate, however, is not entirely appropriate for National Food's location. The clay ITS purchased was excavated from Hancock and Adams Counties in Mississippi, Tr. 1915:6–9, and, to be used in southern Louisiana, that clay had to be transported a considerable distance by barge. Given the significance of transportation costs, *e.g.*, Tr. 150:17–25 (Scoville); Tr. 881:21–23 (Howell), the court finds that the Mississippi borrow pits were located in a different market and that market valued clay less than the one in Plaquemines Parish. As discussed *supra,* clay was an important commodity for various private and local projects in Plaquemines Parish, especially berms, levees, and liners. By contrast, in Mississippi, a lesser demand for clay existed. Proprietors of gravel and sand pits regarded the clay as "something they had to move out of their way to get to the sand and gravel," which permitted Mr.

Thibodaux to acquire it at a relatively cheap price pre-Katrina. Tr. 1935:1–11. Given the importance of transportation costs to the clay business, the pre-Katrina ITS contract provides a price floor for the market for clay in Plaquemines Parish.

 Within the range identified by Mr. Lizak, the court finds that $3.25 per cubic yard is the best approximation of the fair market value of levee-suitable clay in Plaquemines Parish at the time of the taking, discounting any government demand. Wholly apart from the government's need for clay to repair and enhance levees, Plaquemines Parish had a significant demand for clay for use in private and non-federal projects, and the proximity to points of use made the clay moderately more valuable than, for example, the Mississippi clay that was burdened by higher transportation costs. That this price was also the specific value identified by Mr. Lizak as his best estimate is also a factor to be taken into account, albeit a lesser one in the court's view. As in *Bass Enter. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir.1998), just compensation at this level "is determinable even though it may not be precise but falls only within a reasonable range." *See also Todd v. United States*, 155 Ct.Cl. 111, 126 (1961) (awarding just compensation where the "evidence furnishes no basis to determine with any preciseness the fair and reasonable value of plaintiffs' fishing rights destroyed by defendant").

2. *The surface easements.*

 Compared to the clay, computing just compensation for the Corps' remaining seizures is straightforward. To enable the extraction of clay from National Food's property, the Corps took a temporary road easement over 2.16 acres and a temporary easement over 25.8 acres to serve as staging ground. When the government takes an easement, just compensation is typically reckoned by "the difference between the value of the property before and after the [g]overnment's easement was imposed." *Otay Mesa Property, L.P. v. United States*, 670 F.3d 1358, 1364 (Fed.Cir.2012) (quoting *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 632, 81 S.Ct. 784, 5 L.Ed.2d 838

(1961)). For a temporary taking, however, courts typically award "the fair rental value of the property for the period of the taking." *Id.* (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949)).

Mr. Truax testified extensively about the fee value of National Food's land. He stated that, based on comparable sales in the area, plaintiff's property was worth about $2,000 per acre. DX 31–40; Tr. 2164:25 to 2165:3. He opined that the road easement deprived plaintiff of most of the use of those 2.16 acres and that the land was worth only $100 per acre after the imposition of the easement. DX 31–52; Tr. 2167:8–24. This valuation, however, was based upon the mistaken assumption that the road easement was permanent, not temporary. As for the temporary staging area, Mr. Truax assured a rental rate of approximately ten percent of the land's fee value per annum. That would amount to $200 per acre per year. In his report, Mr. Truax stated that the proper compensation for an 18–month temporary easement would be about $7,740. DX 31–52. This estimate appears to be based on the premise that Shaw occupied the land for a year and one-half, however. During the course of the trial, the parties stipulated that Shaw actually occupied the property for approximately nine months. *See* Stip. ¶ 2.

National Food called no witness to challenge or rebut Mr. Truax's valuations of the temporary easements. On the record developed at trial, the court does not have any evidentiary basis to question his assignment of $2,000 per acre as the fee value of National Food's land and ten percent of that fee value as an appropriate rental amount per year. Consequently, the court will award National Food $324 for the temporary road easement on the 2.16 acres and $3,870 for the nine months that Shaw occupied the 25.8-acre staging area.

3. *Interest.*

 As a prevailing plaintiff in an inverse condemnation suit, National Food is entitled to "the value of the property at the time of the taking," and also "such addition as will produce the full equivalent of that

value paid contemporaneously with the taking." *Seaboard Air Line Ry. Co. v. United States,* 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664 (1923). In other words, just compensation "includes a payment for interest." *Library of Congress v. Shaw,* 478 U.S. 310, 317 n. 5, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). The interest awarded by the court ought to emulate what "a reasonably prudent person" would have received had he or she "invested the funds to produce a reasonable return while maintaining safety of principal." *Tulare Lake Basin Water Storage Dist. v. United States,* 61 Fed.Cl. 624, 627 (2004) (quoting *United States v. 429.59 Acres of Land,* 612 F.2d 459, 464–65 (9th Cir.1980)).

The court regards the seven-year Treasury STRIPS[25] rate as appropriate in this case. First, STRIPS reflect minimal risk because they are government-based securities. Second, seven years is a reasonable approximation of the duration between the taking and the date of judgment. Third, the Treasury STRIPS rate can easily be applied to provide comparable interest rates for similarly situated plaintiffs. *See Georgia–Pacific Corp. v. United States,* 640 F.2d 328, 365–66 (Ct.Cl. 1980) (favoring uniform interest rates). In fact, the court has relied on Treasury STRIPS to supply interest rates in prior takings cases. *See, e.g., Arkansas Game & Fish Com'n v. United States,* 87 Fed.Cl. 594, 646–47 (Fed.Cl.2009), *rev'd on other grounds,* 637 F.3d 1366 (Fed.Cir.2011), *cert. granted,* — U.S. —, 132 S.Ct. 1856, 182 L.Ed.2d 641 (2012).

The court applies compound interest, given that the taking occurred over six years ago.

The Federal Circuit has mandated compound interest where it is necessary "to accomplish complete justice" under the Takings Clause. *Dynamics Corp. of Am. v. United States,* 766 F.2d 518, 520 (Fed.Cir.1985) (quoting *Waite v. United States,* 282 U.S. 508, 509, 51 S.Ct. 227, 75 L.Ed. 494 (1931)). Here, Treasury STRIPS are zero-coupon securities that initially are valued at a deep discount from their face value, with imputed interest accruing to maturity, when the only payment on them is made. The imputed interest reflects a compounding factor.

## CONCLUSION

For the reasons stated, the court finds that plaintiff has suffered a taking for which just compensation is due.[26] National Food is entitled to $1,247,580.75 for the clay taken from the borrow pit, $324.00 for the road easement, and $3,870.00 for the storage easement over 25.8 acres of land, totaling $1,251,774.75. The court awards interest on this amount at the seven-year Treasury STRIPS rate from June 1, 2006 to the date the judgment is actually paid. Pursuant to RCFC 54(b), the court determines that there is no just reason for delay in entry of final judgment as specified. The clerk shall accordingly enter a final judgment at this time.

Subsequently, National Food may apply for an award of attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance Act, 42 U.S.C. § 4654(c). In the interest of efficiency, proceedings to adjudicate such an application shall be deferred

---

**25.** STRIPS stands for "Separate Trading of Registered Interest and Principal of Securities." *STRIPS,* TreasuryDirect, http://www.treasurydirect.gov/instit/marketables/strips/strips.htm (last visited August 28, 2012). Treasury STRIPS are "the individual interest payment components of a United States Treasury bond, payable semi-annually over the life of the bond." *Chill v. General Elec. Co.,* 101 F.3d 263, 265 n. 1 (2d Cir.1996). Each individual component becomes a separate marketable security:

> For example, a Treasury note with 10 years remaining to maturity consists of a single principal payment, due at maturity, and 20 interest payments, one every six months over a 10 year duration. When this note is converted into STRIPS form, each of the 20 interest payments

and the principal payment becomes a separate security.

*STRIPS,* TreasuryDirect, http://www.treasurydirect.gov/instit/marketables/strips/strips.htm (last visited August 28, 2012). In effect, "STRIPS are ... 'zero coupon' securities. The only time an investor receives a payment from STRIPS is at maturity." *Id.*

**26.** The court DENIES the government's motion for reconsideration of the earlier ruling in *National Food II* that National Food owned the clay embedded in its land.

The court also DENIES plaintiff's motion to supplement the trial record, filed July 31, 2012, ECF No. 136.

until after the judgment entered under RCFC 54(b) has become final as defined in 28 U.S.C. § 2412(d)(2)(G), including the conclusion of any appellate process on the final judgment.

National Food is awarded its costs of suit, if and to the extent that such costs are not encompassed by an award of fees and expenses under 42 U.S.C. § 4654(c).

It is so ORDERED.